# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 18-1342V**
Filed: April 21, 2026

```
* * * * * * * * * * * * * * * * * * * * * * * *  *
                                                 *
                                                 *
LATISHE BOYD,                                    *
                                                 *
                                                 *
               Petitioner,                       *
                                                 *
                                                 *
v.                                               *
                                                 *
                                                 *
SECRETARY OF HEALTH AND                          *
HUMAN SERVICES,                                  *
                                                 *
                                                 *
               Respondent.                       *
                                                 *
* * * * * * * * * * * * * * * * * * * * * * * *  *
```

*Brian Cinelli*, Schiffmacher Cinelli Adoff LLP, Buffalo, NY, for Petitioner.
*Alexa Roggenkamp*, U.S. Department of Justice, Washington, DC, for Respondent.

## DECISION DENYING ENTITLEMENT[1]

**Shah**, Special Master:

On August 31, 2018, Latishe Boyd ("Petitioner" or "Ms. Boyd") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §§ 300aa-10, *et seq*.[2] (the "Vaccine Act" or "Program"). The petition alleges that a tetanus-diphtheria-acellular pertussis ("Tdap") vaccine Ms. Boyd received on September 4, 2015, caused a "significant aggravation of her existing lupus condition which resulted in multiple seizures and/or caused her to develop a seizure disorder with related sequelae." Pet. at 1. In her briefing, Petitioner more

---

[1] Because this Decision contains a reasoned explanation for the action in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the Decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. For ease of citation, all "§" references to the Vaccine Act in this Decision will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

specifically alleges the vaccination caused "development of seizure disorders and . . . caused significant aggravation of existing illnesses such as lupus, cerebritis or posterior reversible encephalopathy (PRES)." Pet.'s Pre-Hrg. Br. at 1 (ECF No. 42). She also alleges she sustained the Vaccine Table Injury of encephalopathy following Tdap vaccination. Pet.'s Post-Hrg. Br. at 3 (ECF No. 59).

I have reviewed the evidence presented in this case. Although I sympathize with Ms. Boyd and the ordeal she has undergone, I conclude that she has not established by preponderant evidence that the vaccine she received caused or significantly aggravated her condition, nor has she established that she sustained an injury compensable under the Vaccine Table.

I.    **PROCEDURAL HISTORY**

On August 31, 2018, Petitioner filed her petition. ECF No. 1. On August 20, 2019, Respondent filed a Rule 4(c) Report ("Report") recommending that compensation be denied and the case dismissed. Report at 1, 13. On July 6, 2020, Petitioner filed an expert report from James Valeriano, M.D. Ex. 20. On February 8, 2021, Respondent filed expert reports from Miles Evans, M.D., M.S, and Chester Oddis, M.D. Exs. A, C. Petitioner filed a supplemental report from Dr. Valeriano on July 23, 2021. Ex. 20.

Former Special Master Katherine E. Oler conducted an entitlement hearing on February 15-16, 2023. After the hearing, Special Master Oler ordered Petitioner to file potentially missing medical records. ECF No. 51. On April 20, 2023, Petitioner filed a status report stating the medical records were complete. ECF No. 56.

On August 21, 2023, Petitioner filed a post-hearing brief. ECF No. 59. On November 20, 2023, Respondent filed a post-hearing brief. ECF No. 61. On December 20, 2023, Petitioner filed a post-hearing reply brief. ECF No. 61. The parties confirmed the record was complete on January 3, 2024. ECF No. 63.

On August 13, 2024, this case was reassigned to my docket. ECF No. 64. The case is ripe for adjudication.

II.    **FACT EVIDENCE**

A.  **Petitioner's Affidavit and Testimony**

Petitioner signed her affidavit on August 29, 2018. Ex. 1 at 6. She was married with two children.[3] *Id.* at 1. Before the vaccination, she was studying at the University of Baltimore for a joint Master's and J.D. degree. Transcript ("Tr.") at 100. She had completed three years of the four-and-a-half-year program. *Id.* at 101. She was working full time and in school part time. *Id.* At the time of hearing, she was working for the Food and Drug Administration ("FDA") as a

---

[3] The marital status of Ms. Boyd and Mr. White is unclear from the record. While they stated in their affidavits that they were married, they identified as long-term partners during the February 15-16, 2023 entitlement hearing. Tr. at 100, 130.

regulatory counsel, which entailed analyzing compliance with FDA rules and regulations. *Id.* at 101-02. She previously worked as a paralegal for the U.S Department of Justice, Securities and Exchange Commission, and Drug Enforcement Administration. *Id.* at 102.

Ms. Boyd was diagnosed with lupus in 2012 or 2013. Tr. at 103. It started with bad joint pain that would spread. *Id.* Mr. White would frequently take her to the ER at Prince George's Hospital ("PGH") for her debilitating pain, and they would send her home with pain medications without providing additional care. *Id.* Eventually, Mr. White recommended she go to a different hospital since she was not getting better. *Id.* She was ultimately referred to Washington Hospital Center ("WHC") and underwent blood tests, where she was diagnosed with lupus. *Id.* at 104. Her lupus symptoms fluctuated over the years, but medication did stabilize most of her symptoms. *Id.* at 105.

Around the time of vaccination, Ms. Boyd developed an ingrown hair on the left side of her face, near her hairline. Tr. at 107-08. She had developed ingrown hairs on several previous occasions and had them removed at PGH without complications. *Id.* at 107. On September 4, 2015, she went to PGH to get the hair removed. *Id.* at 108-09. After the procedure, the doctor recommended she get a tetanus shot to prevent future infections, because her lupus had "compromised [her] immune system." *Id.* at 110-11. She was hesitant to get the tetanus shot because her lupus symptoms were stabilized and she did not want anything to change, but after speaking with her doctor, she decided to get the vaccination. Ex. 1 at 2. She left the hospital and arrived home very late. Tr. at 111.

Early the next morning, Petitioner woke up and vomited a yellow and white liquid. Ex. 1 at 2; Tr. at 111-12. She remembered falling to the floor trying to get out of bed because she was in immense pain and could not walk; the pain was similar to other lupus flares she had experienced. Tr. at 111-12. The site of the ingrown hair did not emit any pus or colored discharge and was not red, swollen, malodorous, or warm to the touch. *Id.* at 113.

Ms. Boyd's condition deteriorated to the point that she could not walk, and Mr. White had to carry her to the car to go to the hospital. Ex. 1 at 2. While waiting at the ER at PGH, she had a seizure. *Id.* She woke up at the University of Maryland Medical Center ("UMMC"). *Id.*

Petitioner had no personal or family history of seizures. Ex. 1 at 2. She had a total of eight seizures during her hospital stay. Ex. 1 at 3. When she was discharged from the hospital, she had to undergo therapy to learn how to walk and talk again. *Id.* After she had seizures, she would slur her words and was unable to communicate well verbally. *Id.* She has permanent vision loss from her seizures, requiring her to wear glasses and making it difficult to see or drive at night. *Id.* Also, due to repeated intubations and extubations, she lost two of her front teeth, requiring her to undergo multiple dental procedures. *Id.*

Ms. Boyd's recovery was long. She returned to work part time in April 2016, seven months after her seizures began; she did not resume driving until May 2016; and she resumed full-time work in July 2016. Ex. 1 at 3. She has work restrictions. *Id.* at 3-4. The seizures also affected her studies: prior to her injury, she had been working on a master's degree in Legal Ethics and

Studies at the University of Baltimore. *Id.* at 4. She has not attempted to complete her degree due to concerns about her workload and fear of future seizures. *Id.*

Ms. Boyd said her family was also deeply affected by her injury. Her mother-in-law moved into her home for about six to eight weeks to help with household chores. Tr. at 120. As a result of her seizures, she has lingering eyesight issues, which require her to wear glasses daily. *Id.* at 122. She also experiences brain fog and sometimes loses her train of thought. *Id.* at 123. She has memory problems and has to write things down and set reminders on her phone to keep track of tasks and deadlines. *Id.* at 123-24. Her children now need to be aware of signs of seizures, and they have had to curtail family activities to decrease stressors to prevent seizures. Ex. 1 at 4. She used to be very adventurous, participating in skydiving, hiking, and swimming, but she can no longer engage in these activities. *Id.* at 5. Her family has experienced financial pressure due to her medical bills and missed time from work. *Id.*

## B. Affidavit and Testimony of Mr. Gerard White

Mr. White testified that he works as an accountant. Tr. at 128-29. On September 4, 2015, Petitioner returned home from work and said she was going to the hospital for removal of a lesion; Mr. White stayed at home with their kids. Tr. at 132. When she returned home that night, she reported being pressured by the nurse to get a tetanus shot. *Id.* at 135.

Mr. White recalled that the next morning, he woke up to hear Ms. Boyd "groaning in pain." Ex. 5 at 1. He told Petitioner that he was leaving to run some errands. Tr. at 136. When he returned around noon, she was still lying in bed, moaning. *Id.* Later that day, they decided to go to PGH; Mr. White had to carry Petitioner down the stairs to get to the car. *Id.* at 138.

In the ER, Petitioner seemed to be in significant pain. Ex. 5 at 2. She became less responsive and eventually became completely unresponsive, only moaning occasionally. *Id.* After she was admitted to the hospital, she experienced a seizure for the first time. Tr. at 140-41. When she regained consciousness after her first seizure, she could not remember what happened. Ex. 5 at 2. Later, as Mr. White and Petitioner were having a conversation, she had another seizure. Tr. at 142-43. Shortly thereafter, she was transferred to UMMC for specialized care. *Id.*

At UMMC, Petitioner had five additional seizures, one of which was a grand mal seizure. Tr. at 145. She was discharged from UMMC but had another seizure at home, after which she was taken to PGH and then back to UMMC again via helicopter. *Id.* at 146-47.

After her discharge, Petitioner began inpatient therapy at Washington Rehabilitation Center to learn how to walk again, as the seizures had caused her to have equilibrium problems. Tr. at 147. When she returned home, she used a cane and a brace. *Id.* at 148. She continues to have memory and vision issues, which were not present before her seizures. *Id.* at 148-51.

Mr. White recalled that their children were extremely scared and concerned about Ms. Boyd's health. Ex. 5 at 2. Her ability to remember things has been affected by her seizures, and the whole family does everything they can to minimize her chances of suffering any further seizures. *Id.*

4

### C. Medical Records

1. Pre-Vaccination Medical Records

Petitioner was diagnosed with systemic lupus erythematosus ("SLE" or "lupus") in October 2012, at the age of 28. Ex. 4 at 62. She had a number of lupus flares in 2013. *See* Ex. 4. She was prescribed Plaquenil and Imuran but still reported significant lupus symptoms. *See generally id.*

During 2015, Petitioner was seen for lupus at WHC. *See* Ex. 4. On August 24, 2015, she saw rheumatologist Anastasia Markopoulou, M.D. *Id.* at 345-50. She was taking Plaquenil, Imuran, prednisone, and Benlysta. *Id.* at 345. She reported that she experienced chest pain about once a month at night and had concerns about ongoing resting tachycardia. *Id.* She had undergone a cardiac workup, which was normal. *Id.* The pain in her hands, feet, hips, and knees was improving. *Id.* Her lupus was noted to be "clinically stable," with her dsDNA[4] and complement[5] levels improving. *Id.* at 349. The plan was to continue with the prescribed medications. *Id.*

2. Vaccination and Post-Vaccination Medical Records

At about 9:40 p.m. on September 4, 2015, Petitioner visited the ER at PGH for an "infected ingrown hair" located on the left side of her hairline. Ex. 3 at 1-2. She reported: "[P]ain and swelling to left hairline. Started as small bump, expressed pus, now larger in size." *Id.* at 2. She had no systemic complaints. *Id.*

After examination, Petitioner was diagnosed with an abscess. Ex. 3 at 1. An incision and drainage procedure was performed on the abscess, and Petitioner was given the subject Tdap vaccination. *Id.* at 3. The record indicated that she was given "Adacel (Tdap)," which consisted of diphtheria toxoid, acellular pertussis, and tetanus toxoid, at 11:53 p.m. *Id.* She was also prescribed two different antibiotics. *Id.* She was then discharged home. *Id.* at 4.

a. *Hospitalization at PGH: September 6-11, 2015*

At about 8 a.m. on September 6, 2015, Petitioner returned to the ER at PGH, reporting arthralgias, abdominal pain, emesis, and headaches. Ex. 3 at 21-25. She was seen by Brad Schwartz, M.D., who noted that her chief complaint was "[p]ain all over body [sic] trouble walking

---

[4] Anti-dsDNA antibody: a type of antinuclear antibody specific for double-stranded DNA, found in the serum of patients with systemic lupus erythematosus. *Anti-dsDNA antibody*, DORLAND'S MEDICAL DICTIONARY ONLINE ("DORLAND'S"), https://www.dorlandsonline.com/dorland/definition?id=56790 (last accessed on April 2, 2026).

[5] Complement (condensed definition): a term originally used to refer to the heat-labile factor in serum that causes immune cytolysis, the lysis of antibody-coated cells. It is now used to refer to the entire functionally related system comprising at least 20 distinct serum proteins, their cellular receptors, and related regulatory proteins that is the effector not only of immune cytolysis but also of other biologic functions, including anaphylaxis, phagocytosis, opsonization, and hemolysis. *Complement*, DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=10705 (last accessed on April 2, 2026).

after tetanus shot." *Id.* at 21. The triage record stated: "Onset of pain 5 [d]ays." *Id.* The history, however, stated that Petitioner complained of two days of symptoms "status post" her Tdap vaccination. *Id.* at 23. Petitioner stated she believed she was having a lupus flare caused by the Tdap vaccination. *Id.*

On exam, Petitioner was noted to be alert and oriented to person, place, and time. Ex. 3 at 26. The area of her abscess was red, with "possible fluctuance." *Id.* Dr. Schwartz commented: "Most likely lupus flare that was incited by tetanus shot. [Patient] has joint pains, [abdominal] pain, and myalgias…. Other possible [diagnoses] include viral infection, meningitis, [urinary tract infection], pyelo[6], appendicitis…. Viral infection possible." *Id.* at 23.

While Petitioner was in the ER, she "became acutely tachycardic and hypotensive." Ex. 3 at 23. Blood tests revealed a high C-reactive protein ("CRP") level of 268.9mg/L,[7] an elevated erythrocyte sedimentation rate ("ESR"), elevated white blood cell ("WBC") count, elevated neutrophils, slightly elevated level of blood urea nitrogen ("BUN"), high levels of lactic acid and creatinine, and low chloride and calcium levels. *Id.* at 35-36. Treatment was begun with antibiotics, antivirals, and steroids, and Petitioner was admitted to the hospital for "septic shock." *Id.* at 40.

By the time Petitioner was examined as an inpatient, she was lethargic. Ex. 3 at 132. Mr. White gave the history of her condition to Leopoldine Kenmogne, M.D. *Id.* The record stated:

> [S]ymptoms started [two] days ago. [S]he had an [abscess] on left temporal, that was incised in the ED on 9/4/15 and was given a tetanus [s]hot. During the same [night] she started having generalized pain 10/10 sharp, associated with [nausea] and vomiting. [S]he initially [thought] it was the side [effect] of the [shot]. Symptoms progressively got worse she took the [Prednisone] she ha[s] for the lupus, and visited the ED this am, because there was [no] relie[f].

*Id.* The impression was "[p]ossible septic shock [p]robably due to the incised abscess, [hemodynamic] instability [in] the ER, fever, CRP elevated 268, ESR elevated 250." *Id.* at 136. Lupus flare or lupus nephritis, encephalitis, non-anion gap metabolic acidosis, deep vein thrombosis, and gastrointestinal prophylaxis were other potential diagnoses. *Id.* at 136-37.

By September 7, 2015, Petitioner's blood pressure was noted to be stabilized with Levophed. Ex. 3 at 143. Laboratory results were positive for methicillin-resistant *Staphylococcus*

---

[6] "Pyelo" likely referred to pyelonephritis, an inflammation of the kidney and renal pelvis because of bacterial infection; it begins in the interstitial tissues (interstitial nephritis) and rapidly extends to involve the tubules (tubulointerstitial nephritis), glomeruli (glomerulonephritis), and then the renal blood vessels. *Pyelonephritis*, DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=42228 (last accessed on April 2, 2026).

[7] The normal range was between 0.5-5mg/L. Ex. 3 at 35.

*aureus* ("MRSA") by PCR test via nasal swab. *Id.* at 146, 420. The test report commented that a positive PCR result might not correlate to a positive bacterial culture, "since positive test results do not always indicate the presence of viable organisms." *Id.* at 420.

On September 8, Oleksandr Semeniuk, M.D., documented that Petitioner was alert and oriented and had improved clinically. Ex. 3 at 178-79. He diagnosed her with resolved distributive shock of unclear etiology, with septic shock versus anaphylactic shock versus endocrine shock on the differential. *Id*. at 181. He also noted altered mental status, SLE that was dsDNA positive with low complement levels, anemia, and an acute kidney injury. *Id.* at 182.

Petitioner's regular rheumatologist, Dr. Collins, called PGH on September 8, 2015, to inform them he last saw Petitioner on August 24, 2015, and that her bloodwork then "was consistent with… the current lab[s]." Ex. 3 at 179. Petitioner continued to be treated for possible lupus flare, encephalopathy, septic shock, or metabolic acidosis and was "on broad spectrum [antibiotics] and herpes simplex virus ("HSV") coverage with Zosyn and acyclovir." *Id.* at 183-84. She was noted to have altered mental status with minimal ability to communicate. *Id.* at 243. She reported continued joint pain, but the pain had lessened since her admission. *Id.*

On September 9, 2015, Petitioner had two tonic-clonic seizures. Ex. 3 at 241. The first seizure resolved on its own, but the second seizure required treatment with Ativan.[8] *Id.* at 221. An EEG revealed moderate encephalopathy. *Id*. An MRI of the brain was interpreted to indicate posterior reversible encephalopathy syndrome ("PRES"),[9] with primary causes including hypertension, lupus, and others. *Id.* at 190. Hypoglycemia was "an important differential consideration." *Id.*

On September 10-11, 2015, Petitioner had several further seizures, one lasting 5-10 minutes. Ex. 3 at 188, 191. At that point, her team concluded she needed continuous EEG monitoring, necessitating a transfer to UMMC. *Id.* at 191. Her discharge diagnoses included seizure, high blood pressure, resolved possible septic shock, and an SLE flare. *Id.* at 909.

b. *First Hospitalization at UMMC: September 11-21, 2015*

---

[8] Ativan: trademark for preparations of lorazepam. *Ativan*, DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=4704 (last accessed on March 9, 2026); lorazepam: a benzodiazepine with anxiolytic and sedative effects, administered orally in the treatment of anxiety disorders and short-term relief of anxiety symptoms and as a sedative-hypnotic agent, and intravenously or intramuscularly for preanesthetic medication; used also intravenously to control status epilepticus and as an antiemetic in cancer chemotherapy. *Lorazepam*, DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=28747 (last accessed on March 9, 2026).

[9] Posterior reversible encephalopathy syndrome or reversible posterior leukoencephalopathy syndrome: a syndrome resulting from leukoencephalopathy with edema in posterior parts of the occipital and parietal lobes, characterized by headaches, confusion, seizures, and visual disturbances; the brain lesions are most often related to hypertension, and sometimes to use of certain immunosuppressive drugs or to some other cause. Called also posterior leukoencephalopathy s., posterior reversible encephalopathy s., and posterior reversible leukoencephalopathy s. *Reversible posterior leukoencephalopathy syndrome*, DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=111286 (last accessed on April 14, 2026).

On September 11, 2015, Petitioner was transferred to the ICU at UMMC. Ex. 6 at 18. She was noted to be drowsy but could wake up, follow instructions, and speak normally, and she had no focal neurological deficits. *Id.* Her medical records also noted "recent septic shock acute kidney injury ("AKI")[10] recovered possibly lupus cerebritis.[11] MRI findings hypoglycemia due to possible poor [oral] intake at hospital." *Id.* On a different page, it was noted that "MRI showed vasogenic edema consistent with lupus flare." *Id.* at 19.

At UMMC, the history noted that Petitioner had presented to the ER at PGH and "was found to be in shock," and she may have had "lactic acidosis/sepsis/[acute renal failure]." Ex. 6 at 20. She was started on pressors, vancomycin, Zosyn, and steroids; when she was weaned off pressors, she had two seizures on September 9. *Id.* She seized again on September 10 and was given an increased dose of Keppra.[12] *Id.* Her MRI and CT of the head showed vasogenic edema, and she was transferred to UMMC for EEG monitoring. *Id.* She was also noted to have memory issues. *Id.* at 23.

On September 12, 2015, Petitioner was seen by Daniel Harrison, M.D. (attending), and Mark Leekoff, M.D./M.P.H. (resident), for a neurology consultation. Ex. 6 at 41-45. They noted that Petitioner had presented with new-onset seizures "in the setting of [a] lupus flare up." *Id.* at 44. The physicians commented:

> The seizures in the setting of MRI imaging and lupus flare [are] concerning for lupus cerebritis. However[,] PRES and viral encephalopathy could also be in the differential given immunosuppression and the immunosuppression medications she is on. While the WBC [in] [cerebrospinal fluid] was 18 and is high, it would be expected if the [lumbar puncture ("LP")] was done after

---

[10] Acute kidney injury or acute renal failure: renal failure of sudden onset, such as from physical trauma, infection, inflammation, or toxicity; symptoms include uremia and usually oliguria or anuria, with hyperkalemia and pulmonary edema. Three types are distinguished: prerenal, associated with poor systemic perfusion and decreased renal blood flow, such as with hypovolemic shock or congestive heart failure; intrarenal, associated with disease of the renal parenchyma, such as tubulointerstitial nephritis, acute interstitial nephritis, or nephrotoxicity; and postrenal, resulting from obstruction of urine flow out of the kidneys. *Acute renal failure*, DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=74624 (last accessed on April 2, 2026).

[11] Lupus cerebritis: general term for the pathologic manifestations of systemic lupus erythematosus affecting the brain, most of which actually result from inflammation or thrombosis of the cerebral vasculature. *Lupus cerebritis*, DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=64722 (last accessed on April 7, 2026).

[12] Keppra: trademark for a preparation of levetiracetam. *Keppra*, DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=26816 (last accessed March 9, 2026); levetiracetam: an anticonvulsant administered orally as an adjunct in the treatment of partial and myoclonic seizures and idiopathic generalized epilepsy. *Levetiracetam*, DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=28136 (last accessed March 9, 2026).

8

> the seizure. Patient did have a breakthrough seizure on [D]ilantin
> and Keppra but perhaps the dose at the time was suboptimal.

*Id.* Dr. Harrison felt lupus cerebritis was the most likely diagnosis, but he did not rule out an infectious or inflammatory condition, or less likely acute disseminated encephalomyelitis ("ADEM"), "given the temporal association with tetanus vaccination." *Id.* at 45. The plan was to repeat the brain MRI with and without contrast, perform an [magnetic resonance angiograph ("MRA")] of the head, repeat the LP, and treat with high-dose steroids. *Id.*

The same day, Petitioner was seen for a rheumatology consult. Ex. 6 at 37. The physician suspected her seizures had an infectious or inflammatory cause. *Id.* at 40. She was also seen by neurologist Wei Zheng, M.D. *Id.* at 46. During that exam, she informed the nurse that she felt like she was going to have a seizure and then developed seizure-like movements on her right side. *Id.*

Petitioner underwent another brain MRI, with and without contrast, on September 13, 2015, which was interpreted to show lupus-related leukoencephalopathy. Ex. 6 at 51. An EEG conducted on September 15-16, 2015, showed she had experienced focal motor seizures on the right side of her body. *Id.* at 55-56.

On September 15, 2015, Petitioner underwent a repeat LP to rule out encephalitis, the results of which were "not consistent with an infectious etiology." Ex. 6 at 53, 97. She was transferred out of the ICU on September 17, 2015. *Id.* at 110. The next day, she had a rheumatology follow-up, at which it was documented that there were "[n]o findings suggestive of infection in this hospitalization. Symptoms could be [secondary to] lupus." *Id.* at 102.

Dr. Zheng saw Petitioner on September 18, 2015. Ex. 6 at 110. He noted the EEG, completed on September 15, 2015, was "concerning for an epileptogenic pattern." *Id.* He noted that, after the doses of Petitioner's Keppra and Dilantin[13] were increased, she did not have any seizures and "was completely back to her baseline with no neural deficit." *Id.*

Petitioner was discharged from UMMC on September 21, 2015. Ex. 6 at 3. The discharge summary stated:

> 31 [year old female] with [past medical history] of Lupus on
> immunosuppression, presented to [PGH] with [complaint] of
> headache, found to be in septic shock, requiring intubation, pressors,
> admission to MICU. Patient was weaned and extubated. On 9/9
> had 2 seizures, was loaded with AEDs. Patient had additional

---

[13] Dilantin: trademark for preparations of phenytoin. *Dilantin*, DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=14147 (last accessed March 9, 2026); phenytoin: an anticonvulsant used in the treatment of epilepsy other than the petit mal type, the treatment of status epilepticus, and the prevention and treatment of seizures associated with neurosurgery; administered orally. *Phenytoin*, DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=38541 (last accessed March 9, 2026).

> seizure on 9/10, with [altered mental status] after, then transferred to [UMMC] for further [evaluation].  After initial seizures, CT and MRI of head was completed, with vasogenic edema as the primary finding. [Lumbar puncture] was non diagnostic and cultures [had] no growth.

*Id.*

### c.  *Second Hospitalization at UMMC: September 23-October 6, 2015*

On September 23, 2015, Petitioner had a grand mal seizure and was taken back to PGH via ambulance.  Ex. 7 at 1-2.  She was then taken by helicopter to UMMC.  Ex. 3 at 261-62; Ex. 8.  At UMMC, Petitioner was admitted for seizures, encephalopathy, septic shock, lactic acidosis, sinus tachycardia, hypotension, elevated lactate dehydrogenase[14]/transaminitis, and lupus.  Ex. 6 at 208.  Petitioner was intubated and sedated.  *Id.*

Petitioner experienced additional seizures on September 23, 29, and 30, 2015, while at UMMC.  Ex. 6 at 210, 316, 333.  She tested negative for West Nile virus, and tests for other causes for her seizures were inconclusive.  *Id.* at 876.  A September 25, 2015 CT was interpreted as consistent with PRES, and an MRI taken that day showed improvement of PRES, along with vessel narrowing "presumably related to lupus vasculopathy."  *Id.* at 235, 238.

On September 30, 2015, Petitioner's treating neurologist assessed lupus cerebritis.  Ex. 6 at 333.  A record dated October 3, 2015, showed that her current diagnosis was a seizure disorder that was likely secondary to lupus cerebritis.  *Id.* at 373.

### d.  *Later Treatment*

On October 6, 2015, Petitioner was discharged from UMMC and admitted to MedStar Washington Hospital ("MedStar") for occupational and physical therapy.  *See* Ex. 9.  Her history stated:

> 31 [year old] right handed [female] with [past medical history of] SLE since 2012 who presented to UMMC 9/11 new onset witnessed seizures.    MRI    revealed    cerebral    and    cerebellar leukoencephalopathy likely from SLE.  EEG was abnormal.  After work up [patient] thought to have had lupus cerebritis versus lupus flare.  She was discharged to home on Keppra, Dilantin after being seizure free for several days on 9/21.  On 9/23 [patient] was noted

---

[14] Lactate dehydrogenase: an enzyme of the oxidoreductase class that catalyzes the reduction of pyruvate to *(S)*-lactate, using NADH as an electron donor. The reaction is the final step in glycolysis (white fibers). The reverse reaction is the first step in the combustion of lactate (heart, red fibers) or its conversion to glucose (liver). The enzyme occurs in the cytoplasm of nearly all cells. It is a tetramer containing M (muscle) and H (heart) subunits; it exists as five distinct isozymes ($M_4$, $M_3H$, $M_2H_2$, $MH_3$, $H_4$). Identification of isozyme types in serum is used for clinical diagnosis. *Lactate dehydrogenase*,  DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=27400 (last accessed on April 2, 2026).

to not feel well and EMS was called.  When EMS arrived [patient] was [found] [seizing].  Seizures [lasted] >10 minutes and required Ativan during transport to [PGH].  [Patient] was intubated for hypoxia then developed [supraventricular tachycardia ("SVT")] to 180s that was unresponsive to Adenosine[15] and electric cardioversion.  She was then place[d] on Amiodarone[16] drip and admitted to NCCU.  Infectious disease and rheumatology consulted for evaluation[,] felt presentation consistent with SLE cerebritis. LP performed, high opening pressure 45, after CSF culture negative [antibiotics] discontinued.  [Patient] stated on cyclophosphamide[17] infusion and was noted to have mental status improvement.  Her hospital course was complicated by right [intrajugular deep vein thrombosis] that was treated with heparin drip then transitioned to therapeutic [L]ovenox.[18]

---

[15] Adenosine (second definition): a preparation of adenosine, which acts as a cardiac depressant of automaticity in the sinus node and conduction in the atrioventricular node and also as a vasodilator; used as an antiarrhythmic in the treatment of paroxysmal supraventricular tachycardia and as a diagnostic adjunct, in conjunction with myocardial perfusion imaging, to induce coronary artery vasodilation in patients unable to exercise adequately to undergo an exercise stress test; administered intravenously. *Adenosine*, DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=976 (last accessed on March 9, 2026).

[16] Amiodarone hydrochloride: a potassium channel blocking agent that prolongs the action potential duration and refractory period of all cardiac fibers; administered orally or by intravenous infusion in the treatment and prophylaxis of ventricular arrhythmias.  *Amiodarone hydrochloride*, DORLAND'S https://www.dorlandsonline.com/dorland/definition?id=2253 (last accessed March 9, 2026).

[17] Cyclophosphamide: a cytotoxic alkylating agent of the nitrogen mustard group, used as an antineoplastic, often in combination with other agents, for a wide variety of conditions, including Hodgkin disease, lymphosarcoma, acute lymphocytic leukemia, Burkitt lymphoma, carcinoma of the breast, multiple myeloma, chronic lymphocytic leukemia, bronchogenic carcinoma, neuroblastoma, ovarian carcinoma, and carcinoma of the uterine cervix; also used as an immunosuppressive agent to prevent transplant rejection and in the treatment of certain diseases with abnormal immune function. Cyclophosphamide itself is pharmacologically inert; several active metabolites are produced by the microsomal enzyme systems in the liver.  *Cyclophosphamide*, DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=12166 (last accessed March 9, 2026).

[18] Lovenox: trademark for a preparation of enoxaparin sodium.  *Lovenox*, DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=28781 (last accessed March 9, 2026); Enoxaparin sodium: a low-molecular-weight heparin, prepared from porcine intestinal mucosa, that binds to and potentiates the action of antithrombin III, used to prevent pulmonary embolism and deep vein thrombosis following hip or knee replacement or high-risk abdominal surgery; administered subcutaneously. It is also used in conjunction with warfarin in the treatment of deep vein thrombosis, and in conjunction with aspirin in the prevention of coronary thrombosis associated with unstable angina or non–Q wave myocardial infarction.                          *Enoxaparin                sodium*,                DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=16506 (last accessed on March 9, 2026).

Ex. 9 at 1.

Petitioner was discharged from inpatient rehabilitation on October 20, 2015. Ex. 9 at 60. She was noted to have made excellent progress but was advised not to drive or return to work. *Id.* at 63. She continued physical therapy on an outpatient basis until November 16, 2015. *Id.* at 74-87.

On October 27, 2015, Petitioner followed up with rheumatologist Arthur Weinstein, M.D. Ex. 4 at 361. She reported that she was hospitalized "[a]fter having a fever after tetanus shot she received as prophylaxis for scalp infection?" and was treated for neuropsychiatric lupus at UMMC. *Id.* Her rheumatologist recommended that she continue prednisone and start IV Rituxan.[19] *Id.* at 363.

On November 10, 2015, Petitioner saw Martin P. Kolsky, M.D., for a neuro-ophthalmologic evaluation. Ex. 10 at 9. Dr. Kolsky noted a visual field defect and advised that Petitioner should not drive. *Id.* On November 17, 2015, Petitioner saw a rheumatology fellow for a "carbuncle and furuncle." Ex. 4 at 397. She was taken off Benlysta and prescribed Rituxan. *Id.* at 399. She was also prescribed doxycycline for a right axillary abscess and referred to surgery for incision and drainage. *Id.* The boil was drained on November 23, 2015, with no complications. *Id.* at 403-04.

On December 5, 2015, Petitioner saw Dr. Zheng for an initial outpatient consultation. Ex. 6 at 424. Dr. Zheng noted she had been stable since her discharge from rehabilitation. *Id.* Her neurological examination was normal. *Id.* at 426. Dr. Zheng remarked that Petitioner was "completely back to her baseline." *Id.*

Petitioner returned to Dr. Kolsky on December 10, 2015. Ex. 10 at 13. She "continue[d] to demonstrate a rather dense left lower homonymous quadrantanopsia [sic]."[20] *Id.*

On December 24, 2015, Petitioner saw neurologist Mohamad Koubeissi, M.D., who recommended a one-hour EEG and seizure protocol MRI. Ex. 11 at 5. She was advised not to go in a bathtub or swim alone, climb to high elevations, ride a bicycle without a helmet, or operate heavy machinery. *Id.* A January 12, 2016 MRI showed a few nonspecific discrete foci of T2 hyperintensity in petitioner's subcortical matter, which the interpreting radiologist noted could "represent sequela of [an] inflammatory process." *Id.* at 8; Ex. 12 at 3.

---

[19] Rituxan: trademark for a preparation of rituximab. *Rituxan*, DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=43976 (last accessed on April 6, 2026). Rituximab: a chimeric murine/human monoclonal antibody that binds the CD 20 antigen; used as an antineoplastic in the treatment of CD20-positive, B-cell non-Hodgkin lymphoma; administered intravenously. *Rituximab*, DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=43977 (last accessed on April 6, 2026).

[20] Quadrantanopia: hemianopia in one-fourth of the visual field, bounded by a vertical and a horizontal radius. *Quadrantanopia*, DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=42516 (last accessed on April 3, 2026).

On January 26, 2016, Petitioner discontinued Imuran and was advised to continue prednisone. Ex. 4 at 415. On March 8, 2016, she saw neurologist Mark M. Lin, M.D., who diagnosed her with epilepsy of unknown etiology secondary to an occipital lesion, as well as SLE. *Id.* at 483.

On March 24, 2016, Petitioner returned to Dr. Koubeissi, who noted that a January 2016 EEG was within normal limits. Ex. 11 at 10, 13. Dr. Koubeissi advised that she could drive once six months had passed after her last seizure. *Id.* at 12.

Petitioner saw rheumatologist Dr. Collins on August 30, 2016. Ex. 4 at 496. She said she was feeling well. *Id.* She was diagnosed with lupus cerebritis. *Id.* at 499.

On January 26, 2017, Petitioner saw neurologist Robert Laureno, M.D., for epilepsy. Ex. 22 at 3. Her neurologic examination was normal, and Dr. Laureno advised that she continue her current medication regimen. *Id.* at 5.

On August 8, 2017, rheumatologist Michael Belsky, M.D., noted good compliance with her current medications, though she reported intermittent swelling in her hands up to twice per month. Ex. 22 at 35.

On February 7, 2019, rheumatologist Mark Biro, M.D., commented that Petitioner's lupus was "currently stable." Ex. 23 at 39. At a February 24, 2020 neurology follow-up, Petitioner noted that she ran out of Keppra and did not notice a difference when she stopped taking the medication. *Id.* at 158. She and her neurologist, Ahmareen Baten, M.D., discussed weaning off epilepsy medications, as she had been seizure-free for four years. *Id.* at 161.

A rheumatology visit with Dr. Collins on March 3, 2020, was normal, with no signs of active SLE observed. Ex. 23 at 186.

## III.    **EXPERT EVIDENCE**

### A. Expert Reports

#### 1. Petitioner's Expert James Valeriano, M.D.: First Expert Report

Dr. Valeriano authored two expert reports.[21] Ex. 20 ("First Valeriano Rep."); 21 ("Second Valeriano Rep."). He earned his M.D. from the University of Pittsburgh and completed his residency and a clinical neurophysiology fellowship at Georgetown University Medical Center. Ex. 20-1 ("Valeriano CV") at 1. He has served as the Director of the Comprehensive Epilepsy Program and Chairman of the Department of Neurology at Allegheny General Hospital in Pennsylvania, among other positions. *Id.* at 1-2. He has also held several academic positions, including Associate Professor of Neurology at Drexel University College of Medicine and Professor of Neurology at Temple University School of Medicine. *Id.* at 2-3. He is board certified in neurology and clinical neurophysiology. *Id.* at 3. He has published peer-reviewed papers and

---

[21] Dr. Valeriano did not cite any medical literature in support of his first expert report.

book chapters about seizures.  *Id.* at 10-12.  At hearing, Special Master Oler recognized Dr. Valeriano as an expert in neurology.  Tr. at 12.

In describing Petitioner's medical history, Dr. Valeriano stated that she was given a "DPT/Tdap" vaccination on September 4, 2015.  First Valeriano Rep. at 1.  Petitioner experienced "a devastating neurological event after her DPT injection."  *Id.*  Petitioner suffered either lupus cerebritis, "an inflammation of the blood vessels of the brain which led to multiple infarcts, and/or posterior reversible encephalopathy syndrome (PRES) which can be associated with lupus."  *Id.* at 1-2.  Lupus cerebritis and PRES can be difficult to distinguish on MRI.  *Id.* at 2.

Dr. Valeriano noted that Petitioner was diagnosed with ADEM at UMMC.  First Valeriano Rep. at 2.  He disagreed with this assessment, although he acknowledged that PRES and ADEM might appear similar on MRI.  *Id.*  In his view, the MRI images were more consistent with PRES, which he opined was caused by a severe lupus flareup.  *Id.*  The proximate cause of the lupus flare-up was the DTP vaccination.[22]  *Id.*

On causation, Dr. Valeriano pointed to the timing of Petitioner's symptoms in relation to the vaccination: "I believe the evidence is that the proximate cause of the flareup was the vaccination given the timing of the onset of symptomology and the stability of her lupus before this occurred."  First Valeriano Rep. at 2.  Notably, a treating physician at PGH assessed that Petitioner had "most likely [a] lupus flare up that was incited by tetanus shot."  *Id.*; *see also* Ex. 3 at 23.  Also, Petitioner tested negative for infectious causes of her symptoms.  First Valeriano Rep. at 2.  Overall, "the timing of the onset of initial symptoms and subsequent development of seizure activity after the administration of the vaccine on September 4, 2015 is appropriate and consistent with an auto-immune response and resulting lupus flare up and/or development of PRES syndrome following the DTP administration."  *Id.*

Additionally, the pertussis component of the subject vaccine has "epileptogenic potential," and "Ms. Boyd's strong proclivity toward auto-immune disease cannot have helped."  First Valeriano Rep. at 2.  The pertussis toxin, when mixed with adjuvants, can "stimulate aberrant immunologic/inflammatory responses in the brain."  *Id.*

Dr. Valeriano further opined that Petitioner's condition qualifies as a Vaccine Table injury. First Valeriano Rep. at 2 (citing 42 C.F.R. § 100.3).  He explained that the Table includes encephalopathy or encephalitis occurring within 72 hours of the administration of any vaccine "containing whole cell pertussis bacteria, extracted or partial cell pertussis bacterial, or specific pertussis antigens (e.g., DTP, DTaP, P, DPT-Hib)[.]"  *Id.*  Petitioner experienced an encephalopathy as defined by the Table's Qualifications and Aids to Interpretation ("QAI"), because her condition met the criteria for an "acute encephalopathy" that resulted in a "chronic encephalopathy."  *Id.* at 2-3.  Specifically, she exhibited altered consciousness, lethargy, and loss of memory at the time of the initial presentation at PGH.  *Id.* at 3.  These were new symptoms for her.  *Id.*  Her altered mental status persisted, and an EEG "showed evidence of moderate encephalopathy."  *Id.* (citing Ex. 3 at 241).  Furthermore, Petitioner "overtly meets the above requirements for chronic encephalopathy as well since her change in mental or neurological status has persisted for more than 6 months."  *Id.* at 4.  "Her chronic encephalopathy is an epileptic

---

[22] Petitioner received a Tdap, not a DTP, vaccination.

encephalopathy and is specifically listed as a contraindication for pertussis containing vaccines." *Id.* Petitioner continued on an antiepileptic medication regimen for more than six months, and her seizures left her with cognitive, vision, motor and balance impairments. *Id.*

2. <u>Respondent's Expert Miles Evans, M.D.: Expert Report</u>

Dr. Evans authored one expert report. Ex. A ("Evans Rep."). He received his M.D. and M.S. in physiology from the University of Louisville. Ex. B ("Evans CV") at 1. He completed a residency in neurology and a fellowship in neuropharmacology at the Washington University School of Medicine. *Id.* He has held a number of academic and hospital positions and currently serves as the Clinical Neurophysiology Fellowship Program Director, Professor of Medicine in Neurology, and Director of the Epilepsy and Neurophysiology Program at the University of Louisville. *Id.* at 2-3. He is board certified in neurology and clinical neurophysiology. *Id.* at 4.

Dr. Evans has led studies relating to seizures and epilepsy and has published 39 peer-reviewed papers. Evans CV at 7-9, 10-12. He was recognized at hearing as an expert in neurology. Tr. at 279.

Dr. Evans included a detailed summary of Petitioner's medical history. Evans Rep. at 1-11. Before the vaccination, her lupus symptoms included joint pain, along with chest pain sometimes severe enough to require ER visits. *Id.* at 2. She was treated with hydroxychloroquine (Plaquenil), Benlysta infusions, and prednisone. *Id.* As of May 2015, Petitioner's blood work revealed that her lupus was "active and not entirely controlled disease." *Id.* at 11. However, at her last rheumatology visit before her vaccination on August 24, 2015, she reported improved joint pain and less frequent chest pain. *Id.* at 2. Dr. Evans agreed with the lupus diagnosis. *Id.* at 11.

In addition to her lupus, Petitioner had several other medical conditions that pre-dated her vaccination, including hypertension, constipation with rectal bleeding, pneumonia, cystitis, alopecia, and sinus tachycardia, among others. Evans Rep. at 2-3. She also suffered from recurrent boils beginning in 2013. *Id.* at 3. She did not have a history of seizures or epilepsy. *Id.*

Dr. Evans noted that the subject vaccine contained diphtheria toxoid, acellular pertussis, and tetanus toxoid. Evans Rep. at 4. Petitioner was given the vaccination during a visit to PGH for treatment of a boil along her left hairline. *Id.* The boil was observed to have overlying cellulitis. *Id.* The boil was incised and drained. *Id.* Petitioner was given antibiotics, "presumably because of her lupus and immunosuppressive treatment." *Id.*

Although the bacteriology of boils is not known, the most common causal bacterium is *Staphylococcus aureus*. Evans Rep. at 13 (citing Djillali Annane et al., *Septic shock*, LANCET 365: 63–78 (2005) (Ex. C-2) ("Annane")). On September 7, 2015, Petitioner tested positive for MRSA, a strain of *Staphylococcus aureus*. *Id.* (citing Ex. 3 at 146, 420). Dr. Evans believed that a MRSA infection associated with Petitioner's facial abscess probably caused her to develop septic shock. Evans Rep. at 13. He stated:

> The evidence is strongly in favor of the ED physician's diagnosis of
> septic shock. The patient clearly had shock, as shown by her low

blood pressure, tachycardia and evidence of end organ dysfunction. Dysfunction of the brain in shock produces mental status changes or frank loss of consciousness. Her mental status in the ED is not clearly documented, but changes are referred to in the medical record. The petitioner's affidavit indicates she has no memory [of] the ED after leaving the triage area, and her husband's affidavit states that while in the waiting room she stopped talking or answering questions. Both of these indicate brain dysfunction at that time. Kidney dysfunction, which is very common in shock, was also present—her creatinine level was 3.0, very elevated for a person without renal disease, and after admission she developed the syndrome of acute kidney injury (AKI).

*Id.* at 12. Her laboratory results were also consistent with septic shock, including her elevated lactic acid and low bicarbonate and $CO_2$ levels. *Id.* at 12-13. Her WBC and neutrophil levels were elevated for a patient on immunosuppressive drugs, potentially signifying a "catastrophic infection." *Id.* at 13. The presence of banded neutrophils was indicative of bacterial sepsis. *Id.* Also, sepsis and septic shock are relatively common conditions and result in many hospitalizations and high rates of death, including in lupus patients and patients who are immunosuppressed. *Id.* (citing Hearns W. Charles, *Abscess drainage*, SEMIN. INTERVENT. RADIOL. 29, 325-336 (2012) (Ex. C-7) ("Charles")); Greg S. Martin et al., *The Epidemiology of Sepsis in the United States from 1979 through 2000*, N. ENGL. J. MED. 348; 1546-1554 (2003) (Ex. C-21) ("Martin"); Arthur Mageau et al., *Septic shock among patients with systemic lupus erythematosus: Short and long-term outcome. Analysis of a French nationwide database*, J. INFECT. 78, 432-438 (2019) (Ex. C-19) ("Mageau"); Fabio E. Ospina et al., *Distinguishing infections vs flares in patients with systemic lupus erythematosus*, RHEUMATOLOGY 56, i46-i54 (2017) (Ex. C-23) ("Ospina")).

Sepsis can result from many types of infections, including abscesses. Evans Rep. at 13. Given that Petitioner was positive for MRSA, which can cause facial abscesses, and given the severity of her condition, Dr. Evans felt her sepsis was likely caused by MRSA infection. *Id.* He pointed out that although Petitioner's blood cultures came back negative for any specific infectious organism, positive cultures are not required for a sepsis diagnosis, and culture-negative sepsis is common. *Id.* (citing Shipra Gupta et al., *Culture-Negative Severe Sepsis: Nationwide Trends and Outcomes*, CHEST 150, 1251-1259 (2016) (Ex. C-10) ("Gupta")). Additionally, Petitioner's cultures might have been negative because she was taking antibiotics before the onset of her symptoms. *Id.*

Dr. Evans commented that Petitioner developed mental status changes while hospitalized, including two seizures that occurred on September 9, 2015. Evans Rep. at 13-14. An MRI of the brain showed cerebral leukoencephalopathy, indicating damage to the white matter appearing as vasogenic edema concentrated in the posterior region of the brain. *Id.* at 14. This was consistent with PRES. *Id.* Further MRIs were also interpreted to show PRES. *Id.* Petitioner's other clinical signs, including mental status changes, visual deficits, focal neurological deficits, and seizures, were also suggestive of PRES. *Id.* (citing Archana Hinduja, *Posterior Reversible Encephalopathy Syndrome: Clinical Features and Outcome*, FRONT NEUROL. 11, 71 (2020) (Ex. C-12) ("Hinduja")).

16

PRES has been described in many different conditions, including sepsis, septic shock, autoimmune disorders, and in association with the use of immunosuppressive drugs. Evans Rep. at 14. PRES is very commonly associated with seizures and can be associated with brain hemorrhage. *Id.* Petitioner suffered both seizures and a hemorrhage that caused a permanent visual field defect. *Id.*

Dr. Evans felt Petitioner's MRIs "were less consistent with lupus cerebritis, and instead were entirely consistent with PRES." Evans Rep. at 14. He did not believe she had ADEM. *Id.* at 18. He disagreed that her initial complaints were suggestive of a lupus exacerbation; the pain she experienced was far more severe than that associated with her previous flareups. *Id.* at 15. Also, her complement and dsDNA levels at the time of her hospitalization did "not support a severe exacerbation" of lupus. *Id.* Her CRP and ESR rates were high in the hospital, which was consistent with sepsis but not an acute lupus flareup. *Id.*

Dr. Evans did not agree with the diagnosis of neuropsychiatric lupus ("NPSLE"), assigned by some of Petitioner's treating physicians. Evans Rep. at 16. Instead, he felt her condition was better explained by a PRES diagnosis. *Id.* To the extent she had NPSLE, it manifested as PRES, which is a separate diagnosis that fully explained her condition. *Id.* Her PRES was "more likely to have resulted from sepsis and septic shock," which in turn was triggered by infection. *Id.* at 16-17.

Similarly, Dr. Evans opined that Petitioner's seizures were caused by PRES. Evans Rep. at 17. PRES causes seizures in a large majority of patients. *Id.* (citing Hinduja). Her visual impairment was due to the brain hemorrhage she suffered due to PRES. *Id.*

Dr. Evans pointed out that Petitioner received an acellular version of the pertussis vaccine, as opposed to the older, whole cell pertussis vaccine, DPT. Evans Rep. at 18-19. Dr. Valeriano's discussion of the potential toxicity of the DPT vaccine was therefore inapplicable. *Id.* (citing Karina A. Top and Scott A. Halperin, *Pertussis and Other Bordetella Infections*, HARRISON'S PRINCIPLES OF INTERNAL MEDICINE. McGraw-Hill Education, pp.1-8 (2015) (Ex. C-25) ("Top and Halperin"); Katrina Kretsinger et al., *Preventing tetanus, diphtheria, and pertussis among adults: use of tetanus toxoid, reduced diphtheria toxoid and acellular pertussis vaccine recommendations of the Advisory Committee on Immunization Practices (ACIP) and recommendation of ACIP, supported by the Healthcare Infection Control Practices Advisory Committee (HICPAC), for use of Tdap among health-care personnel*, MMWR RECOMM. REP. 55, 1-37 (2006) (Ex. C-17) ("Kretsinger")). The Tdap vaccine has been well studied for the potential to cause seizures, with reassuring results. *Id.* at 19 (citing William E. Barlow et al., *The risk of seizures after receipt of whole-cell pertussis or measles, mumps, and rubella vaccine*, 9 N. ENGL. J. MED. 345, 656-661 (2001) (Ex. C-4) ("Barlow"); Natasha J. Brown et al., *Vaccination, seizures and 'vaccine damage'*, CURR. OPIN. NEUROL. 20, 181-187 (2007) (Ex. C-6) ("Brown")). There is no clinical data linking the Tdap vaccine to PRES, though there are a few case reports describing PRES after MMR vaccinations. *Id.* (citing Kursad Aydin et al., *Reversible posterior leukoencephalopathy and Adie's pupil after measles vaccination*, J. CHILD NEUROL. 21, 525-527 (2006) (Ex. C-3) ("Aydin"); Tadanori Hamano et al., *Posterior reversible encephalopathy syndrome following measles vaccination*, J. NEUROL. SCI. 298, 124-126, (2010) (Ex. C-11) ("Hamano")). In any event, her

17

PRES was more likely caused by Petitioner's sepsis, septic shock, lupus, and/or immunosuppression. *Id.*

Dr. Evans concluded:

> It is clear that Ms. Boyd suffered a very severe acute illness shortly after [incision and drainage ("I&D")] and vaccination. Within hours after her I&D she developed symptoms, and approximately 32 hours after her I&D she returned to the ED where she developed septic shock, causing encephalopathy and the other signs of shock. About 3 days after that she had her first seizure, which was determined by MRI scanning of the brain to be due to PRES. Because of the sepsis, PRES and recurrent seizures, as well as possible lupus exacerbation, she had a prolonged hospital course. Despite the severity of her illness she has had substantial clinical recovery. Her last brain MRI scan five months after onset of her illness showed good resolution of the PRES. The timing and clinical course of all of this is typical for these conditions. It is understandable that she might associate her severe acute illness with vaccination, but the evidence in the case is conclusively against vaccination having a causative role.

Evans Rep. at 20.

### 3. Respondent's Expert Chester Oddis, M.D.: Expert Report

Dr. Oddis authored one report. Ex. D ("Oddis Rep."). Dr. Oddis received his M.D. from Pennsylvania State University. Ex. E ("Oddis CV") at 1. He completed his internal medicine internship and residency at Pennsylvania State University and a fellowship in rheumatology at the University of Pittsburgh. *Id.* He is the Director of the Myositis Center and a Professor of Medicine at the University of Pittsburgh School of Medicine. *Id.* at 3. He is board certified in internal medicine and rheumatology. *Id.* at 3. He estimated that he has published over 150 peer-reviewed papers. Tr. at 155. He was recognized as an expert in rheumatology. *Id.* at 158.

Dr. Oddis agreed with Petitioner's lupus diagnosis. Oddis Rep. at 2. He believed that Petitioner's lupus disease course would be "classified as stable with previous episodes of mild to moderate flares of SLE," but requiring several different medications to control. *Id.* at 5, 7. At her last rheumatology appointment before the vaccination, she was clinically stable with improving ds-DNA and complement levels. *Id.* at 4. She had a low WBC count at that time, which was not unusual in a lupus patient. *Id.*

Dr. Oddis commented that at the time of Petitioner's hospital admission on September 6, 2015, her elevated WBC count of 10.2 and her "markedly elevated CRP 'should raise the suspicion for infection in a patient with SLE.'" Oddis Rep. at 5. He agreed with Dr. Evans that her scalp abscess likely led to sepsis and then septic shock. *Id.* at 8. The acuteness and severity of the septic shock led to seizures. *Id.* Also, seizures occur in 20% or more of lupus patients. *Id.* (citing Peter

H. Schur, *Neurological manifestations of systemic lupus erythematosus*, UpToDate (Ex. F-1) at 7; Daniel J. Wallace and Dafna D. Gladman, *Clinical manifestations and diagnosis of systemic lupus erythematosus in in adults*, UpToDate (Ex. F-3) ("Wallace and Gladman") at 6). Thus, the infection was the likely trigger of Petitioner's seizures; whether the seizures are characterized as "PRES" or "lupus cerebritis" is immaterial from a causation standpoint. *Id.* at 5-6.

Dr. Oddis disagreed that Petitioner's condition was caused by the Tdap vaccination, explaining that a vaccine would be highly unlikely to trigger a lupus flare of this magnitude. Oddis Rep. at 8-9. "[H]er condition was most likely triggered by sepsis, as symptoms, labs, and clinical course were entirely consistent when a physiological response to an overwhelming bacterial infection (i.e. the scalp abscess)." *Id.* at 8. He cited to the Wallace paper to opine that vaccines generally do not have any impact on the natural course of SLE. *Id.* at 8-9 (citing Daniel J. Wallace, *Overview of the management and prognosis of systemic lupus erythematosus*, UpToDate (Ex. F-1) ("Wallace")).

### 4. Dr. Valeriano's Second Expert Report

In reply to Respondent's experts, Dr. Valeriano opined that he did not believe Petitioner had sepsis; instead, she had a lupus flareup caused by her Tdap vaccination. Second Valeriano Rep. at 1. Although sepsis was part of the differential diagnosis, that did not explain her condition. *Id.* The nature of Petitioner's abscess was superficial, requiring only a minor procedure to address, and she was afebrile at the time of the procedure. *Id.* She was given oral antibiotics, which would have prevented sepsis. *Id.* Her symptoms the following day, which included arthralgias and abdominal pain, would be uncommon in sepsis. *Id.* at 2. Lastly, her blood cultures were negative. *Id.*

In Dr. Valeriano's view, Petitioner's WBC count of 10.2 and high CRP levels were non-specific, as high CRP levels are evidence of inflammation, which was likely caused by her PRES. Second Valeriano Rep. at 2. The strongest indicator of possible sepsis in Petitioner was hypotension, but that also could have been caused by other factors such as dehydration, stress, or pain. *Id.* She was "afebrile and had significant arthralgias, which are much more common to lupus flares." *Id.*

Dr. Valeriano pointed out that Petitioner had three diagnoses on her differential: PRES, ADEM, and lupus cerebritis. Second Valeriano Rep. at 3-4. Both ADEM and lupus cerebritis involve an immune response that, in his view, would suggest her condition was precipitated by a lupus flareup "directly related to the vaccine." *Id.* at 4. "If it were PRES syndrome, this could be caused either by sepsis or by a lupus flare-up," but a lupus flareup was the more likely trigger. *Id.*

Regarding causation, the Tdap vaccine includes the pertussis toxin, which is a known neurotoxin and "can elicit an epileptogenic response in a susceptible adult individual such as Ms. Boyd." Second Valeriano Rep. at 4. Petitioner's lupus made her more susceptible to an inflammatory trigger. *Id.* The "[p]ertussis toxin, mixed with adjuvants, [was] designed to elicit a serological antibody response, [and] can stimulate aberrant immunologic/inflammatory responses in the brain and can cause seizure activity." *Id.* Dr. Valeriano cited medical literature demonstrating that the pertussis toxin can cause lethal encephalopathy in mice. *Id.* at 5 (citing

19

DeRen Huang et al., *Pertussis Toxin-Induced Reversible Encephalopathy Dependent on Monocyte Chemoattractant Protein-1 Overexpression in Mice*, J. NEUROSCI. 22(24), 10633–10642 (2002) (Ex. 21-2) ("Huang")).  He also pointed out that the CDC contraindicates the diphtheria, tetanus, acellular pertussis ("DTaP") vaccine for infants who have previously suffered collapse/shock-like state, seizure, or inconsolable crying within 2-3 days of receiving a prior dose of the vaccine.  *Id.* He opined:

> The animal model studies in combination with the clinical observations of vaccinated infants, strongly indicate that the Pertussis Toxin has the capacity to elicit neurological side-effects in adults, especially in those individuals whose background make them particularly sensitive and/or who have pre-existing immune responses to common biomolecules, or who have underlying medical issues that increase[] the propensity for adverse reactions to the vaccine.  Just as SLE may make one more prone to infection, it certainly makes one more prone to an adverse autoimmune response.

*Id.* at 6.

## B. Expert Testimony

### 1. Dr. Valeriano

Dr. Valeriano testified on the first day of the entitlement hearing and discussed the symptoms of lupus, which include arthralgias, arthritis, and myalgias.  Tr. at 13.  Less common effects of lupus include renal failure, cardiomyopathies, or serositis pericarditis.  *Id.*  Prior to vaccination, Petitioner suffered from periodic lupus flares/arthralgias, but no other symptoms.  *Id.* at 14.  Her lupus was stable before the vaccination.  *Id.* at 15-18.  The day after vaccination, however, she reported generalized joint and muscle pain.  *Id.* at 19-20.  Dr. Valeriano felt it was significant that Petitioner described her symptoms as similar to lupus flareups she had experienced in the past.  *Id.* at 21.

Petitioner also developed seizures after vaccination.  Tr. at 21.  Dr. Valeriano broadly defined a seizure as an electrical storm in the brain that causes brain cells to discharge, with symptoms that are dependent on which neurons are discharged.  *Id.* at 22.  Seizures are usually the result of an injury to the brain, but one can lose neurons if there are numerous seizures.  *Id.* at 23.  Cumulatively, repeat seizures, particularly in quick succession, can lead to general cognitive issues, affecting memory and the ability to multitask, make decisions, and plan.  *Id.* at 23-24.  Dr. Valeriano believed that the number of seizures Petitioner experienced led to permanent injuries, including epilepsy.  *Id.* at 25-26.

Dr. Valeriano testified that Petitioner had three potential diagnoses: lupus cerebritis, ADEM, and PRES.  Tr. at 26-28.  Lupus cerebritis is "a fairly unusual condition" associated with lupus that is caused by inflammation of blood vessels in the brain.  *Id.* at 26.  It can present with encephalopathy and/or with micro-infarcts that "can lead to strokes."  *Id.* at 26-27.  ADEM is an

immune mediated condition that causes inflammation of the brain. *Id.* at 27. PRES is associated with lupus and other immune mediated conditions, which often presents with seizures. *Id.* at 28-29. These conditions are difficult to discern from one another clinically, but on MRI, one might be able to distinguish ADEM from PRES. *Id.* at 29.

Dr. Valeriano opined that, based on Petitioner's MRI, her condition was most consistent with PRES. Tr. at 28, 30. Any of the three conditions on her differential, however, could have been triggered by the Tdap vaccination. *Id.* at 31.

Dr. Valeriano believed the onset of Petitioner's condition was signified by the diffuse muscle and joint pain that she experienced the morning of September 6, 2015. Tr.at 33. Her nausea and vomiting could have been part of her presentation as well. *Id.* These symptoms were consistent with a lupus flareup. *Id.*

Several of Petitioner's treating physicians associated her generalized pain with her tetanus vaccine. Tr. at 35-37. Testing in the hospital ruled out infections. *Id.* at 40-41. Ultimately, most of Petitioner's physicians believed that her symptoms were caused by a lupus flareup, but Dr. Valeriano did not believe that was an adequate explanation for what happened. *Id.* at 41. At least some of her treating providers believed the vaccine was responsible. *Id.* at 42.

Regarding the specific mechanism, Dr. Valeriano admitted he was not a vaccine expert. Tr. at 42-43. Pertussis is a neurotoxin, but he did not believe Petitioner's condition was directly caused by the toxin. *Id.* Instead, the vaccine started "an immune reaction in a woman who was prone to immune reactions,… activating [her] lupus." *Id.* at 43-44. Petitioner's symptomology was consistent with a lupus flareup, indicating that the vaccine exacerbated or flared up her lupus. *Id.* at 44.

Dr. Valeriano disagreed with Respondent's experts that Petitioner's presentation could be explained entirely by septic shock. Septic shock usually occurs in the setting of an overwhelming infection. Tr. at 44. It often presents with hypotension, fever, confusion, aches and pains, and increased heart rate. *Id*. at 44-45. Seizures are not commonly associated with septic shock, but they can occur. *Id.* at 46. Petitioner was afebrile when she arrived at PGH, which would be an atypical presentation of septic shock. *Id.* at 46-47. Also, although Petitioner was on prophylactic antibiotics at the time of onset, her blood cultures were completely negative, which would be unusual in sepsis. *Id.* at 50-51.

Petitioner had low blood pressure, which can be caused by septic shock, but could also have been caused by dehydration or pain. Tr. at 52-53. She reported several days of vomiting since receiving the tetanus vaccination, which could have led to dehydration, and her creatinine levels were low, also consistent with dehydration. *Id.* at 54-55.

Dr. Valeriano acknowledged that Petitioner's low oxygen saturation and low oxygen levels could be a part of septic shock presentation. Tr. at 47. Also, the fact that Petitioner was on immunosuppressants for her lupus could have affected her ability to produce white blood cells, so while her WBC was not particularly high, that did not rule out septic shock caused by infection. *Id.* at 56. However, high WBC and CRP levels could be seen in a wide variety of conditions,

including a lupus flare. *Id.* at 58.

Petitioner's incision and drainage procedure, performed on September 4, 2015, appeared to be a minor procedure and therefore was unlikely to have led to something as severe as septic shock. Tr. at 60-61. Nothing in the medical records indicated that there was a severe infection at the site of her abscess, which he would expect if she had sepsis. *Id.* at 62. Dr. Valeriano believed the abscess was superficial and cutaneous, rather than subcutaneous. *Id.* at 63, 65.

Petitioner had signs of acute encephalopathy in the hospital, including significant changes in mental status, decreased level of consciousness, difficulty with concentration, lethargy, and sluggish pupillary reactions. Tr. at 67-68. The records document that she had an altered mental status ("AMS") with minimal communication that occurred within 72 hours of vaccination. *Id.* at 70; *see also* Ex. 3 at 243. As such, Dr. Valeriano concluded that Petitioner suffered an encephalopathy consistent with the Vaccine Injury Table. *Id.* at 71. Petitioner's EEG "was somewhat confirmatory for encephalopathy." *Id.* at 72; *see also* Ex. 3 at 241. Her neurological issues continued for quite some time, with additional seizures, cognitive difficulties, and visual impairment. *Id.* at 73-74.

On cross examination, Dr. Valeriano confirmed he was not board certified in rheumatology. Tr. at 76. He confirmed that Petitioner's abscess had fluctuance and overlying cellulitis. *Id.* at 81-82; *see also* Ex. 3 at 3. He also acknowledged that Petitioner's treating physicians entertained septic shock as a diagnosis. *Id.* at 82-83; *see also* Ex. 3 at 22, 132, 136. He agreed that some of Petitioner's treating physicians believed she developed sepsis as a result of her incised abscess. *Id.* at 84; *see also* Ex. 3 at 136, 141.

Dr. Valeriano summarized his theory as: the Tdap vaccine, in a patient with an autoimmune disease, set off an immune response that exacerbated her underlying lupus, which led to the cascade of events and symptoms Petitioner suffered. Tr. at 86. Her initial complaints of muscle aches and pain, joint aches, were evaluated and seen as a possible lupus flare. *Id.* While both lupus and sepsis were plausible, the clinical facts "fit[] better with the lupus." *Id.* at 87.

When asked specifically what in the Tdap vaccine caused the lupus flare, Dr. Valeriano stated that any vaccine stimulates the immune system and that similar to vaccine-induced Guillain-Barré syndrome, the "immune system attacks your nervous system." Tr. at 88. The lupus flare was then the proximate cause of the PRES. *Id.* Dr. Valeriano could not name any specific antibodies, cytokines, or immunoglobins in the immunological process to explain how the Tdap vaccine caused the lupus flare, since he was not an immunologist. *Id.* at 89. He also conceded that had Petitioner's blood cultures been indicative of sepsis, he would not have concluded her condition was vaccine induced. *Id.* at 90.

On redirect, Dr. Valeriano reiterated that encephalopathy and prolonged seizures were listed as contraindications on the Tdap vaccination package inserts, especially for the pertussis component; some patients should receive the TD vaccine, rather than the Tdap vaccine, because the pertussis component could cause issues in patients like Ms. Boyd. Tr. at 91-92.

    2. <u>Dr. Oddis</u>

22

Dr. Oddis explained that lupus/SLE is a systemic, autoimmune disease that attacks the body in many different ways, with symptoms that can range from mild to life-threatening. Tr. at 159-60. Lupus flares are common in a patient's disease course; they can have either a slow onset or a rapid development of symptoms, which tends to be more serious. *Id.* at 160. Symptoms of a flare can include rash, fatigue, joint pain, mouth sores, shortness of breath, serositis (pain with breathing), heart problems, and kidney and/or respiratory failure. *Id.* at 160-61. Neurological symptoms can also occur, "from actually just depression all the way up to seizures." *Id.* at 161. The diagnosis of SLE requires a positive ANA test, and C3, C4, dsDNA, and inflammatory marker levels are typically monitored for disease activity. *Id.* at 161-62. Doctors treat lupus patients with hydroxychloroquine, prednisone, and sometimes Benlysta, methotrexate, Imuran, and other immunosuppressive drugs. *Id.* at 163-64.

Dr. Oddis opined that as of August 2015, Ms. Boyd's lupus was not overtly or severely active, but it was "smoldering." Tr. at 164. She was on four different medications (prednisone, Imuran, hydroxychloroquine, and Benlysta). *Id.* at 165. Her symptoms included arthritis, rash, and serositis, and her bloodwork never totally normalized even with immunosuppressive medications. *Id.* at 165. She had a persistently low WBC count before vaccination, indicating a "low level of immunity." *Id.* at 165-66.

Petitioner's rapid deterioration on September 6, 2015, was consistent with septic shock caused by infection. Tr. at 167. She had low blood pressure and required pressors to keep her blood pressure stable. *Id.* She also had lactic acidosis, worsening kidney function, an increased WBC count (from 2.4 to 10.2), and increased "bands."[23] *Id.* Petitioner's bandemia (elevated bands), combined with her elevated CRP level of 269, indicated she had an infection. *Id.* at 167-68. Once her infection was under control, her WBC count returned to a normal level of 2.2. *Id.* at 168.

Petitioner's presentation and rapid decompensation were more consistent with an infection than a lupus flare. Tr. at 178. Dr. Oddis cited the rapid improvement of her kidney function in response to treatment and extremely elevated CRP levels, which were "over a hundred times

---

[23] Dr. Oddis later explained:

> So whenever you have a white blood cell count, that white blood cell count has several different components. There's neutrophils, there's leukocytes, and then one of the components are called bands, and whenever you have an elevated band count, that means your bone marrow is putting out white blood cells that are immature, and that doesn't occur with lupus. That occurs with infection. So whenever you have an elevated -- a relatively elevated percentage of band cells in the distribution of the types of white blood cells, then that is supportive of infection, not supportive of a lupus flare.

Tr. at 251.

normal CRP." *Id.* at 180-81, 187.   She was also treated with Levophed, a blood pressure medication that is only administered for "serious sepsis and serious hypotension." *Id.* at 182.   In his opinion, the "clinical presentation [was] overwhelmingly in support of infection[.]" *Id.* at 169. Dr. Oddis also pointed out that a severe infection could cause a lupus flare, so the two conditions are not mutually exclusive. *Id.* at 183.   Here, to the extent Petitioner suffered symptoms of lupus, they were likely triggered by her infection. *Id.* at 190.

Dr. Oddis noted that Petitioner was on three immunosuppressive medications for her lupus. Tr. at 184-85.   As a result, she was at higher risk for an infection. *Id.* at 182.   Her negative blood cultures were consistent with her ingestion of two antibiotics. *Id.* at 185.   Finally, he noted that a patient with sepsis will "feel like a truck hit them…. They ache all over. Their muscles hurt. Their joints hurt. [It] can be a pretty dramatic presentation of musculoskeletal symptoms." *Id.* at 186. This was congruent with Petitioner's clinical picture. *Id.* at 187-88.

Dr. Oddis disagreed with Dr. Valeriano's assessment that Petitioner's abscess was superficial and could not have caused an infection. Tr. at 172-74.   The abscess was a "significant inflammatory skin problem" because there was cellulitis, meaning soft tissue inflammation, around the abscess, indicative of infection. *Id.* at 172.   The abscess was draining pus. *Id.*   Petitioner was prescribed two different antibiotics because "they [were] treating an infection." *Id.* at 173.   A surgical consultation was requested, indicating that the abscess was abnormal. *Id.* at 175-76.   Also, Petitioner tested positive for MRSA on September 7, 2015. *Id.* at 176-77.   Dr. Oddis explained:

> If you're colonized with MRSA -- that's Methicillin-resistant staphylococcus aureus, MRSA -- and there is the risk that you could be colonized with MRSA and then that could again cause an infection.   And the reason that that might be important is that although she's cultured negative from a blood culture perspective, remember, this patient was given two antibiotics, both of which will suppress the growth of staph in the blood, but yet if your body is already colonized with MRSA -- and it could be colonized because she's on multiple immunosuppressive medications anyway that allows your body to be colonized with MRSA -- then she is at risk for a MRSA infection because of the colonization.

*Id.* at 177.

Dr. Oddis noted that Petitioner had a seizure on September 9, 2015, and her imaging showed PRES. Tr. at 168, 193-94.   He agreed with Dr. Valeriano that PRES was a more accurate diagnosis than lupus cerebritis, in part because seizures are more common with PRES than lupus cerebritis. *Id.* at 196.   PRES is associated with lupus, hypertension, and immunosuppressive medications. *Id.* at 168-69.   In his view, Petitioner's PRES was likely triggered by her septic shock, given the totality of the clinical course. *Id.* at 193.

24

Dr. Oddis opined that it was unlikely the vaccine could have caused "the degree of catastrophic change that was observed in this case." Tr. at 199. He had not heard about or experienced such an occurrence in his clinical practice. *Id.* Vaccination is typically recommended in lupus patients, unless they are in the midst of a major flare. *Id.* He concluded that Petitioner suffered an infection, leading to septic shock and PRES. *Id.* at 201. Her injury did not meet the criteria for a Table injury because there was another cause of encephalopathy (infection and septic shock). *Id.* at 202.

On cross, Dr. Oddis acknowledged that several treating physicians attributed or temporally related Petitioner's condition to the Tdap vaccine. Tr. at 227-29. He also admitted that Petitioner's WBC count was, on several occasions before the vaccination, higher than 2.4, suggesting her WBC in the hospital was not markedly elevated from baseline. *Id.* at 231-34. However, he argued that a lupus flare would not have caused the WBC level that was seen in Petitioner. *Id.* at 234. Similarly, her elevated CRP level was not a reliable marker of a lupus flare. *Id.* at 234-35. He acknowledged Petitioner was afebrile on admission, but he believed that was explained by her use of prednisone and other immunosuppressive drugs. *Id.* at 236; *see also id.* at 249 ("So that's a -- and this is a common problem that we see in patients with lupus and other autoimmune diseases that are on chronic prednisone, along with other immunosuppressants. Their bodies oftentimes do not mount the febrile response with infection that we see in patients that have normal immune systems."). Also, while fever is more likely than not in sepsis, "[o]verwhelming sepsis patients can be afebrile." *Id.* at 236.

In response to questioning from Special Master Oler, Dr. Oddis testified that Petitioner's vomiting on the day after vaccination was more suggestive of sepsis than a lupus flare, because she did not previously complain of gastrointestinal symptoms associated with lupus flares. Tr. at 246. He disagreed with Dr. Valeriano that Petitioner's low blood pressure could have been caused by a "pain response" or dehydration, as it required treatment with Levophed, which is only given for severe hypotension. *Id.* at 247. Furthermore, Petitioner's elevated creatinine levels were not consistent with lupus nephritis, because they normalized quickly with treatment; "if lupus is attacking your kidney, it would not reverse the elevated creatinine in a matter of days." *Id.* at 248. Her dsDNA level was better than it had been before the vaccination, which would not suggest she was having a lupus flare. *Id.* at 250. Her CRP level was dramatically elevated, indicating a strong likelihood of infection given the immunosuppressive medications she was taking. *Id.* at 253. The fact that Petitioner had negative blood cultures for MRSA, but a positive nasal swab, could be explained by the fact that the tests were done at different times and while Petitioner was on antibiotics. Tr. at 254-55. Dr. Oddis explained:

> So, again, putting the totality of everything together -- the low blood pressure, the lack of a fever response, the elevated creatinine, the need for pressors, the higher white blood cell count, the CRP that's off the wall -- again, that all points to an infectious process as opposed to any element of a lupus flare.

25

*Id.* at 249.

### 3. Dr. Evans

Dr. Evans believed Petitioner's medical course to be consistent with a localized infection represented by the abscess on her forehead that developed into septic shock. Tr. at 281. She then experienced a number of seizures caused by PRES. *Id.* at 282. One of her seizures resulted in status epilepticus, which necessitated her second hospital admission. *Id.* Dr. Evans did not believe Petitioner's condition had anything to do with the Tdap vaccine; rather, her localized infection spread to the blood, causing sepsis, septic shock, and a "post-reversible septic shock syndrome." *Id.* at 283. Her MRIs confirmed the PRES diagnosis; when the imaging of PRES cleared up, her clinical signs also improved. *Id.*

Dr. Evans opined that Petitioner's symptoms on September 6, 2015, were explained by sepsis. Tr. at 286. Her myalgia (muscle pain) was consistent with sepsis; myalgia is more suggestive of infection than joint pain, but both myalgia and joint pain can occur with sepsis. *Id.* Her WBC count of 10.2 also suggested sepsis. *Id.* at 287. Because she was taking immunosuppressive drugs, this count qualified as significantly elevated. *Id.* Her high lactic acid level was a sign that her tissues were not getting enough oxygen. *Id.* at 288. Her manual count of segmented neutrophils was elevated, consistent with sepsis or bacterial infection. *Id.* at 289-90. Lastly, she had a "highly abnormal" count of bands, or immature white blood cells, also a sign of bacterial infection. *Id.* at 290-91.

According to Dr. Evans, Petitioner had a localized infection, which presented as an abscess/boil, which could have spread to her blood, leading to sepsis and septic shock. Tr. at 291-92. Her positive MRSA finding supported this conclusion. *Id.* at 293. Everyone has staph aureus on their skin, but MRSA is highly prevalent in hospitals because of its resistance to antibiotics. *Id.* at 293-94.

Petitioner's negative blood cultures did not affect Dr. Evans's opinion that she had sepsis. Tr. at 294. About 30-50% of patients with sepsis will have a negative blood culture because of the antibiotics they are taking for treatment. *Id.* at 297-98. Antibiotics are better at inhibiting growth in a culture than inhibiting growth in the bloodstream. *Id.* at 298.

Regarding whether an abscess could lead to sepsis, Dr. Evans admitted it was unusual but possible, which is why Petitioner was given antibiotics after the incision and drainage of her abscess. Tr. at 299. The record of the incision and drainage procedure noted that there was fluctuance and some cellulitis of the skin, suggesting infection. *Id.* at 301. It also documented that Petitioner's skin was cold, clammy, mottled, and blue, which are signs of poor blood flow to the skin and are also signs of shock, including possible septic shock. *Id.* at 302. There was also mention of a rash and signs of infection on the left side, indicative of continued cellulitis. *Id.* at 302-03.

Dr. Evans described PRES as fluid leaking into the brain, which has distinctive features on MRI. Tr. at 306-07. Symptoms of PRES include encephalopathy, seizures, and visual disturbance. *Id.* at 307. It is a reversible condition, but a complete recovery might not occur. *Id.* Petitioner

had the typical signs of PRES on MRI. *Id.* at 307. Her lesion resolved within several weeks. *Id.* at 307-08.

Dr. Evans was not sure whether Dr. Valeriano's assessment of epilepsy in Petitioner was accurate. Tr. at 308. She had a number of seizures and was treated with anti-epileptic medication, but it is unclear whether Petitioner continued to have seizures after resolution of her PRES. *Id.* at 308-09. She continued to take anticonvulsant medications, but she had not undergone an EEG to observe seizures or confirm epilepsy. *Id.* at 309. Because Petitioner suffered from such extreme seizures, treatment with anti-seizure medications was proper, but there was not enough information to make a definitive epilepsy diagnosis. *Id.*

On cross-examination, Dr. Evans clarified that his opinion that Petitioner had sepsis was not dependent on her positive MRSA swab, but the positive swab indicated it was highly likely she had a MRSA infection. Tr. at 317. He did not agree with Dr. Valeriano that Petitioner's lupus was clinically stable prior to receipt of the Tdap vaccination; he believed that she was improving, and therefore not stable. *Id.* at 324. He confirmed that Petitioner was transported to UMMC for better care, they discharged her with a diagnosis of "seizures secondary to lupus cerebritis," and several physicians believed Petitioner's seizures were related to either a lupus flare or lupus cerebritis. *Id.* at 326-27, 329-31. Most of Petitioner's physicians did not believe her seizures were caused by sepsis. *Id.* at 328. One physician believed that Petitioner's seizures were "[m]ost likely lupus flare that was incited by a tetanus shot." *Id.* at 331; *see also* Ex. 3 at 67.

Dr. Evans admitted that, had lupus cerebritis been the correct diagnosis, that would have been a severe exacerbation of her underlying lupus. Tr. at 314. He acknowledged that Petitioner did suffer six months of sequelae and that her neurological deficits could be permanent. Tr. at 320-21.

Answering questions from former Special Master Oler, Dr. Evans defined an encephalopathy as altered mental status. Tr. at 351. Petitioner's condition probably did fit the definition of encephalopathy. *Id.* Her memory issues, however, did not constitute an encephalopathy but were instead the result of specific focal brain damage. *Id.* at 355. The timing and development of PRES were consistent with infection and septic shock. *Id.* ADEM was properly considered as an alternative diagnosis but was eliminated based on her MRI, as it presents a distinctive picture. *Id.* at 356.

Dr. Evans explained that shock is defined as a condition of low blood pressure that compromises organ function, typically with brain dysfunction as a first sign. Tr. at 357. Petitioner had two episodes of shock, one caused by status epilepticus, and another caused by septic shock. *Id.* at 358. While there are many causes of shock, it is notable that Petitioner showed improvement when she was treated for sepsis. *Id.* Petitioner had many signs of septic shock, like elevated lactic acid, neutrophils, band forms, and reduced bicarbonate. *Id.* at 361. Her response to treatment, and rapid recovery within two days, is indicative of sepsis, not a lupus exaggeration. *Id.* at 361-62.

## IV.    LEGAL FRAMEWORK

### A. Petitioner's Burden in Vaccine Program Cases

Under the Vaccine Act, a petitioner may prevail in one of two ways. First, a petitioner may demonstrate that she suffered a "Table" injury—i.e., an injury listed on the Vaccine Injury Table —that occurred within the time provided in the Table. § 11(c)(1)(C)(i). "In such a case, causation is presumed." *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1320 (Fed. Cir. 2006); *see* § 13(a)(1)(B). Second, where the alleged injury is not listed in the Vaccine Injury Table, a petitioner may demonstrate that she suffered an "off-Table" injury caused or significantly aggravated by the vaccination. § 11(c)(1)(C)(ii).

For both Table and non-Table claims, Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof. § 13(a)(1). That is, a petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1322 (Fed. Cir. 2010); *see also Snowbank Enter. v. United States*, 6 Cl. Ct. 476, 486 (1984) (mere conjecture or speculation is insufficient under a preponderance standard). The petitioner must demonstrate that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352-53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Hum. Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). A petitioner may not receive a Vaccine Program award based solely on her own assertions; rather, the petition must be supported by either medical records or the opinion of a competent physician. § 13(a)(1).

To establish entitlement to a Vaccine Program award of compensation for a non-Table claim, a petitioner must satisfy all three of the elements established by the Federal Circuit in *Althen v. Secretary of Health and Human Services*, 418 F.3d 1274 (Fed. Cir. 2005). *Althen* requires a petitioner to establish by preponderant evidence that the vaccination she received caused her injury "by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Id.* at 1278.

Each of the *Althen* prongs requires a different showing. Under *Althen* prong one, petitioner must provide a "reputable medical theory," demonstrating that the vaccine received *can cause* the type of injury alleged. *Pafford*, 451 F.3d at 1355-56 (citations omitted). To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548-49 (Fed. Cir. 1994). Such a theory must only be "legally probable, not medically or scientifically certain." *Id.* at 549; *Bunting v. Sec'y of Health & Hum. Servs.,* 931 F.2d 867, 873 (Fed. Cir. 1991) (proof of medical certainty is not required).

Petitioner may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or presentation of a generally accepted medical theory. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1378-79 (Fed. Cir. 2009) (citing *Capizzano*, 440 F.3d at 1325-26). Special masters, despite their expertise, are not empowered by statute to conclusively resolve what are complex scientific and medical questions, and thus the scientific evidence offered to establish *Althen* prong one is viewed "not

28

through the lens of the laboratorian, but instead from the vantage point of the Vaccine Act's preponderant evidence standard." *Id.* at 1380.  Special masters must take care not to increase the burden placed on petitioners in offering a scientific theory linking vaccine to injury, but this does not negate or reduce a petitioner's ultimate burden to establish her overall entitlement to damages by preponderant evidence. *W.C. v. Sec'y of Health & Hum. Servs.*, 704 F.3d 1352, 1356 (Fed. Cir. 2013) (citations omitted).

The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records.  *Althen*, 418 F.3d at 1278; *Andreu*, 569 F.3d at 1375-77; *Capizzano*, 440 F.3d at 1326 ("medical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury'") (quoting *Althen*, 418 F.3d at 1278).  Medical records are generally viewed as particularly trustworthy evidence, because they are created contemporaneously with the treatment of the patient. *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).  However, medical records and/or statements of a treating physician's views do not *per se* bind the special master to adopt the conclusions of such an individual, even if they must be considered and carefully evaluated.  § 13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 746 n.67 (2009) ("there is nothing … that mandates that the testimony of a treating physician is sacrosanct–- that it must be accepted in its entirety and cannot be rebutted").  As with expert testimony offered to establish a theory of causation, the opinions or diagnoses of treating physicians are only as trustworthy as the reasonableness of their suppositions or bases.  The views of treating physicians should also be weighed against other, contrary evidence also present in the record -- including conflicting opinions among such individuals. *Hibbard v. Sec'y of Health & Hum. Servs.*, 100 Fed. Cl. 742, 749 (2011) (not arbitrary or capricious for special master to weigh competing treating physicians' conclusions against each other), *aff'd*, 698 F.3d 1355 (Fed. Cir. 2012); *Veryzer v. Sec'y of Health & Hum. Servs.*, No. 06-522V, 2011 WL 1935813 at *17 (Fed. Cl. Spec. Mstr. Apr. 29, 2011), *mot. for review den'd*, 100 Fed. Cl. 344, 356 (2011), *aff'd without opinion*, 475 Fed. App'x. 765 (Fed. Cir. 2012).

The third *Althen* prong requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1278.  That term has been equated to the phrase "medically acceptable temporal relationship." *Id.* at 1281.  A petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation." *de Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008).  The explanation for what is a medically acceptable timeframe must also coincide with the theory of how the relevant vaccine can cause an injury (*Althen* prong one's requirement). *Id.* at 1352; *Shapiro v. Sec'y of Health & Hum. Servs.*, 101 Fed. Cl. 532, 542 (2011), *recons. den'd after remand on other grounds*, 105 Fed. Cl. 353 (2012), *aff'd without op.,* 503 F. App'x. 952 (Fed. Cir. 2013); *Koehn v. Sec'y of Health & Hum. Servs.*, No. 11-355V, 2013 WL 3214877 (Fed. Cl. Spec. Mstr. May 30, 2013), *mot. for review den'd*, 113 Fed. Cl. 757 (Fed. Cl. Dec. 3, 2013), *aff'd*, 773 F.3d 1239 (Fed. Cir. 2014).

### B. Significant Aggravation Claims

The Vaccine Act defines significant aggravation as "any change for the worse in a preexisting condition which results in markedly greater disability, pain, or illness accompanied by substantial deterioration of health." 42 U.S.C. § 300aa-33(4). In *Loving*, the United States Court of Federal Claims established the governing six-part test for off-Table significant aggravations. Petitioner must prove by a preponderance of the evidence:

> (1) The person's condition prior to administration of the vaccine, (2) the person's current condition (or the condition following the vaccination if that is also pertinent), (3) whether the person's current condition constitutes a 'significant aggravation' of the person's condition prior to vaccination, (4) a medical theory causally connecting such a significant worsened condition to the vaccination, (5) a logical sequence of cause and effect showing that the vaccination was the reason for the significant aggravation, and (6) a showing of a proximate temporal relationship between the vaccination and the significant aggravation.

*Loving v. Sec'y of Health & Hum. Servs.*, 86 Fed. Cl. 135, 144 (2009); *see also W.C. v. Sec'y of Health & Human Servs.*, 704 F.3d 1352, 1357 (Fed. Cir. 2013) (adopting this test for significant aggravation claims brought under the Vaccine Act). *Loving* prongs four, five, and six are derived from the Federal Circuit's test for off-Table actual causation cases. *Althen v. Sec'y of Health & Hum. Servs.*, 17 F.3d 374 (Fed. Cir. 1994).

In *Sharpe,* the Federal Circuit clarified the *Loving* prongs and what is required by petitioners to successfully demonstrate a causation-in-fact significant aggravation claim. *Sharpe v. Sec'y of Health & Hum. Servs.,* 964 F.3d 1072 (Fed. Cir. 2020). *Loving* prong three only requires a comparison of a petitioner's current, post-vaccination condition with his pre-existing pre-vaccination condition. *Id.* at 1082; *Whitecotton v. Sec'y of Health & Hum. Servs.,* 81 F.3d 1099 (Fed. Cir. 1996). A petitioner is not required to demonstrate an expected outcome or that his post-vaccination condition was worse than such an expected outcome. 964 F.3d at 1081. Further, a petitioner is not required "to disprove that a pre-existing genetic mutation caused [his] significant aggravation." *Id.* at 1087.

Under *Loving* prong four, a petitioner need only provide a "medical theory causally connecting [petitioner's] significantly worsened condition to the vaccination." *Sharpe*, 964 F.3d at 1083; *see also Loving*, 86 Fed. Cl. at 144. In other words, petitioner is required to present a medically reliable theory demonstrating that a vaccine "can cause a significant worsening" of the condition. *Sharpe*, 964 F.3d at 1083 (citing to *Pafford ex. rel. Pafford v. Sec'y of Health & Hum. Servs.,* 451 F.3d 1352, 1356-57 (Fed. Cir. 2006). A petitioner may be able to establish a prima facie case under *Loving* prong four without eliminating a pre-existing condition as the cause of her significantly aggravated injury. *Id.*; citing *Walther v. Sec'y of Health & Hum. Servs.,* 485 F. 3d

1146, 1151 (Fed. Cir. 2007) (noting that "the government bears the burden of establishing alterative causation. . . . once petitioner has established a prima facie case").

*Loving* prong five requires a petitioner to show "a logical sequence of cause and effect showing that the vaccination was the reason for the significant aggravation." *Loving,* 86 Fed. Cl. at 144. In other words, petitioner must show that the vaccination "did" cause a worsening of [petitioner's underlying disorder]. *Id.* Finally, *Loving* prong six, similar to *Althen* prong three, requires a medically appropriate temporal interval between the vaccination and the worsening of the petitioner's pre-existing condition. *Id.*

### C. Law Governing Analysis of Fact Evidence

The process for making factual determinations in Vaccine Program cases begins with analyzing the medical records, which are required to be filed with the petition. § 11(c)(2). The special master is required to consider "all [] relevant medical and scientific evidence contained in the record." § 13(b)(1)(A). This includes "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," and the "results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." *Id.* The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is evidenced by a rational determination).

Medical records created contemporaneously with the events they describe are generally trustworthy, because they "contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions," where "accuracy has an extra premium." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1382 (Fed. Cir. 2021) (citing *Cucuras*, 993 F.2d at 1528). Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight. *See generally Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475 at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). Indeed, contemporaneous medical records are often found to be deserving of greater evidentiary weight than oral testimony–– especially where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Hum. Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992), *cert. den'd*, *Murphy v. Sullivan*, 506 U.S. 974 (1992) (citing *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 396 (1947) ("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.")).

However, there are situations in which compelling oral testimony may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Hum. Servs.*, 69 Fed. Cl. 775, 779 (2006) ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475 at *19 ("[w]ritten

31

records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent") (quoting *Murphy*, 23 Cl. Ct. at 733)).  Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded.  *Andreu*, 569 F.3d at 1379; *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist.  *LaLonde v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014).  In deciding whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony, a rational analysis must be explicated.  *Burns*, 3 F.3d at 417.

### D. Analysis of Expert Testimony

Establishing a sound and reliable medical theory connecting the vaccine to the injury often requires a petitioner to present expert testimony in support of his or her claim.  *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1361 (Fed. Cir. 2000).  Vaccine Program expert testimony is usually evaluated according to the factors for analyzing scientific reliability set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594-96 (1993).  *See Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1339 (Fed. Cir. 2010) (*citing Terran v. Sec'y of Health & Hum. Servs.*, 195 F.3d 1302, 1316 (Fed. Cir. 1999)).  "The *Daubert* factors for analyzing the reliability of testimony are: (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards for controlling the error; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community."  *Terran*, 195 F.3d at 1316 n.2 (citing *Daubert*, 509 U.S. at 592-95).

The *Daubert* factors play a slightly different role in Vaccine Program cases than in other federal judicial proceedings.  Those factors are employed by judges to exclude evidence that is unreliable and potentially confusing to a jury.  In Vaccine Program cases, the factors are used in the weighing of the reliability of scientific evidence.  *Davis v. Sec'y of Health & Hum. Servs.*, 94 Fed. Cl. 53, 66-67 (2010) ("uniquely in this Circuit, the *Daubert* factors have been employed also as an acceptable evidentiary-gauging tool with respect to persuasiveness of expert testimony already admitted").  The flexible use of the *Daubert* factors to evaluate persuasiveness and reliability of expert testimony has routinely been upheld.  *See, e.g.*, *Snyder*, 88 Fed. Cl. at 743.  In this matter (as in numerous other Vaccine Program cases), *Daubert* has not been employed at the threshold to determine what evidence should be admitted, but instead to determine whether expert testimony offered is reliable and/or persuasive.

Respondent frequently offers one or more experts of his own to rebut a petitioner's case.  Where both sides offer expert testimony, a special master's decision may be "based on the

credibility of the experts and the relative persuasiveness of their competing theories." *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1347 (Fed. Cir. 2010) (citing *Lampe*, 219 F.3d at 1362). Nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Snyder*, 88 Fed. Cl. at 743 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). A "special master is entitled to require some indicia of reliability to support the assertion of the expert witness." *Moberly*, 592 F.3d at 1324. Weighing the relative persuasiveness of competing expert testimony, based on a particular expert's credibility, is part of the overall reliability analysis to which special masters must subject expert testimony in Vaccine Program cases. *Id.* at 1325-26 ("[a]ssessments as to the reliability of expert testimony often turn on credibility determinations"); *see also Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1250 (Fed. Cir. 2011) ("this court has unambiguously explained that special masters are expected to consider the credibility of expert witnesses in evaluating petitions for compensation under the Vaccine Act").

### E. Consideration of Medical Literature

Finally, although this decision discusses some but not all the record evidence in detail, I have reviewed and considered all the materials submitted in this matter. *See Moriarty v. Sec'y of Health & Hum. Servs.*, 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("We generally presume that a special master considered the relevant record evidence even though [s]he does not explicitly reference such evidence in h[er] decision."); *Simanski v. Sec'y of Health & Hum. Servs.*, 115 Fed. Cl. 407, 436 (2014) ("[A] Special Master is 'not required to discuss every piece of evidence or testimony in her decision.'") (citation omitted), *aff'd*, 601 F. App'x. 982 (Fed. Cir. 2015).

## V. ANALYSIS

Petitioner makes several claims. She first alleges she sustained the Table Injury of encephalopathy within 72 hours of her Tdap vaccination. Pet.'s Post-Hrg. Br. at 3. Second, she alleges she suffered a significant aggravation of her lupus, which led to her development of PRES and a seizure disorder, that was caused in fact by the vaccination. *Id.* at 10. Lastly, she alleges that she developed the primary injury of "seizures and related sequelae" caused in fact by the vaccination. *Id.*

The record evidence established that Petitioner most likely suffered septic shock as a result of an infected abscess, which in turn caused her to develop PRES. Her condition did not meet the Table criteria for encephalopathy following Tdap vaccination, because her symptoms were fully explainable by an acute infectious disease. The evidence did not preponderantly show that her acute or ongoing symptoms were caused by the Tdap vaccination, either directly or through a significant aggravation of her pre-existing lupus. I conclude that Petitioner has failed to preponderantly prove any of her claims.

### A. Diagnosis

As a threshold matter, a petitioner must establish that he suffered the injury for which he seeks compensation. *Broekelschen*, 618 F.3d at 1346. "[T]he function of a special master is not

to 'diagnose' vaccine-related injuries, but instead to determine 'based on the record as a whole and the totality of the case, whether it has been shown by a preponderance of the evidence that a vaccine caused the [petitioner]'s injury.'" *Andreu*, 569 F.3d at 1382 (quoting *Knudsen*, 35 F.3d at 549). "Although the Vaccine Act does not require absolute precision, it does require the petitioner to establish an injury – the Act specifically creates a claim for compensation for 'vaccine-related injury or death.'" *Stillwell v. Sec'y of Health & Hum. Servs.*, 118 Fed. Cl. 47, 56 (2014) (quoting 42.U.S.C. § 300aa-11(c)). Accordingly, the Federal Circuit has concluded that it is "appropriate for the special master to first determine what injury, if any, [is] supported by the evidence presented in the record" before applying a causation analysis pursuant to *Althen*. *Lombardi v. Sec'y of Health & Hum. Servs.*, 656 F.3d 1343, 1351-53 (Fed. Cir. 2011).

Petitioner contended that her medical course was more consistent with a severe exacerbation of her lupus and/or a primary seizure disorder/epilepsy, and it was not explained by septic shock with neurological sequelae. Respondent and his experts contend that the overall clinical picture was entirely explainable by septic shock triggered by overwhelming infection, likely originating with Petitioner's facial abscess.

### 1. Petitioner was susceptible to infection, sepsis, and septic shock because of her SLE and the immunosuppressive medications she was taking.

At the outset, I note that Petitioner's expert, Dr. Valeriano, is not an expert in rheumatology, and therefore he was not as well qualified to opine on lupus as Dr. Oddis, who sees 40-50 patients a year with lupus and was a principal investigator on a study involving Rituximab, one of the medications Petitioner used. Tr. at 156-57. Dr. Valeriano reported that he sees approximately 25-30 lupus patients a year but does not treat their lupus, just their neurological symptoms. Tr. at 78.

All of the experts and treating physicians agreed that Petitioner had pre-existing lupus. As Dr. Oddis explained, lupus is a systemic autoimmune condition that can cause a variety of symptoms ranging from mild to life-threatening. Tr. at 159-60; *see* Wallace and Gladman at 2. Because the disease involves immune system attacks on the body's own tissues, it is frequently treated with immunosuppressant therapies. Tr. at 163-64. These treatments, as the name suggests, suppress the immune system. One marker of this is a relatively low WBC count, which is commonly seen in immunosuppressed patients. *See* Oddis Rep. at 4.

Because lupus involves immune dysfunction and often requires treatment with immunosuppressants, patients are at higher risk for infections of all types, including sepsis, and septic shock. Tr. at 184-85 (Dr. Oddis's testimony); *see also* Ospina at 2 (noting that approximately 25% of lupus patients die of infections; risk factors for infection in such patients include use of immunosuppressive treatments); Mageau at 432 ("SLE patients are prone to infection, as well as septic shock, either because of immunosuppressive treatment or intrinsic dysregulation of the immune system."). Septic shock in SLE patients is associated with worsened morbidity and mortality. Mageau at 437. Also, in the Mageau study, septic shock patients with SLE were "younger and more often female" compared to the general population of patients with septic shock. *Id.* at 436.

34

2.   Petitioner's facial abscess signified that she was suffering from an infection on September 4, 2015.

The day of vaccination, Petitioner sought treatment in the ER for an ingrown hair on her face. Ex. 3 at 1-2. She reported there was "pain and swelling to left hairline. Started as small bump, expressed pus, now larger in size." *Id.* at 2. She had no systemic complaints such as fever or myalgias. *Id.* An exam showed a 2x2-cm lesion with fluctuance and overlying cellulitis. *Id.* at 3.

Petitioner was diagnosed with a facial abscess. Ex. 3 at 1. An incision and drainage procedure was performed, and she was given the subject Tdap vaccination. *Id.* at 3. She was also given two separate antibiotics. *Id.*

Dr. Valeriano opined that Petitioner's abscess was relatively minor and not indicative of an active infection likely to lead to sepsis. He described the lesion as cutaneous and superficial. Tr. at 364. The incision and drainage procedure was also quite routine and unlikely to have led to something as severe as septic shock. Tr. at 60-61. Nothing in the medical records indicated that there was a severe infection at the site of her abscess. *Id.* at 62.

The evidence showed that facial abscesses are generally caused by bacterial infections, including MRSA. Evans Rep. at 13; Oddis Rep. at 8-9. Immunosuppression is a risk factor for abscess. *See* Denis Spelman and Larry Baddour, *Cellulitis and skin abscess: Epidemiology, microbiology, clinical manifestations, and diagnosis*, UPTODATE (Ex. C-26) ("Spelman") at 3. Facial abscesses can lead to sepsis through leakage of bacteria into the bloodstream, though this is unusual. Evans Rep. at 13; Tr. at 299 (Dr. Evans's testimony); *see* Charles at 325 (noting that abscesses can cause sepsis). In Petitioner's case, as Respondent's experts persuasively commented, the facial abscess showed evidence of infection, such as fluctuance and cellulitis, at the time it was drained. Tr. at 172 (Dr. Oddis's testimony); 299 (Dr. Evans's testimony). It was treated as an active infection: two antibiotics were prescribed to prevent the development of sepsis. *Id.* at 173, 299. Dr. Oddis characterized the abscess as a "significant inflammatory skin problem." *Id.* at 172.

3.   Petitioner's symptoms and lab results at the time of her hospitalization were indicative of an overwhelming infection and septic shock.

Petitioner testified that after the incision and drainage procedure and vaccination, she woke up to immediately vomit a yellowish-white fluid. Tr. at 112. She was in immense pain and could not walk. *Id.* When she looked at her abscess, she did not observe colored discharge or pus, nor was it red, swollen, malodorous, or warm to the touch. *Id.* at 113.

The medical records documented that Petitioner presented back to the PGH ER at about 8 a.m. on September 6, 2015, about 32 hours after the incision and drainage procedure and Tdap vaccination. Ex. 3 at 21. Her chief complaint at that time was "[p]ain all over body [sic] trouble walking after tetanus shot." *Id.* She reported vomiting since she received her "tetanus" vaccination "3 days ago," and she said she was not tolerating fluids, had myalgias, and had weakness in her legs. *Id.* at 23.

35

At first, Petitioner was noted to be alert and oriented to person, place, and time. Ex. 3 at 26. She did not have a fever. *Id.* The area of her abscess was red, with "possible fluctuance." *Id.* While Petitioner was still in the ER, she became acutely hypotensive and tachycardic. *Id.* at 23. The treating physicians had to administer Levophed, a pressor given for severe hypotension. *Id.* at 143. She became lethargic and minimally responsive. *Id.* at 132. In her affidavit, she stated she could not recall what happened in the ER after she was triaged. Ex. 1 at 2.

Petitioner had highly abnormal lab tests in conjunction with her symptoms, including an extremely elevated CRP of 268.9 mg/L, an elevated ESR of 250, critically elevated lactic acid, elevated creatinine, low chloride, low calcium, and elevated BUN. Ex. 3 at 35. Her blood also showed high levels of segmented and banded neutrophils. *Id.* at 36. Her WBC count was 10.2. *Id.* at 34. She was presumptively diagnosed with septic shock.

Sepsis is defined as "infection with evidence of systemic inflammation, consisting of two or more of the following: increased or decreased temperature or leucocyte count, tachycardia, and rapid breathing. Septic shock is sepsis with hypotension that persists after resuscitation with intravenous fluid." Annane at 63. About 2% of hospital admissions are for sepsis. *Id.*

Dr. Valeriano acknowledged that some of Petitioner's symptoms and signs were consistent with septic shock, but he disputed that interpretation of the overall constellation of symptoms. He did not construe the records to document signs of a severe infection at the site of the abscess, and he opined that the procedure done on September 4, 2015, was minor and unlikely to result in septic shock. Tr. at 60-62. Petitioner did not have a fever, which would be expected in septic shock. *Id.* at 46-47. She reported to the examining physicians that she believed she was having a lupus flareup, and her symptoms, such as joint and muscle pain, could occur in a flareup or with vomiting and dehydration. *Id.* at 21. Her hypotension in the ER likewise could have been triggered by pain from a lupus flareup or dehydration. Second Valeriano Rep. at 2; Tr. at 52-53. Her high CRP and elevated WBC count were non-specific for sepsis and could have been caused by a range of conditions. Tr. at 58.

The literature in the record indicated that a lupus flareup can be difficult to distinguish from an infection like sepsis. Ospina at i46 ("[T]he initial clinical presentation of a patient with lupus is very similar to the acute febrile phase of an infection (such as sepsis)."). Nonetheless, Drs. Evans and Oddis persuasively explained that Petitioner's clinical picture was entirely consistent with septic shock and inconsistent with a lupus flareup. Petitioner's initial symptoms, including her vomiting and severe myalgias, were indicative of infection and sepsis. Tr. at 186 (Dr. Oddis's testimony that sepsis patients can have "a pretty dramatic presentation of musculoskeletal symptoms."); *id.* at 286 (Dr. Evans's testimony that her myalgias were consistent with sepsis). Vomiting was not a typical symptom associated with Petitioner's previous lupus flareups. *Id.* at 246. Also, at the time of admission, her facial abscess was observed to have slight redness and possible fluctuance, suggestive of infection; a surgical consultation was also requested for possible repeat drainage. Ex. 3 at 141; *see* Tr. at 175-76.

Petitioner's rapid decompensation in the ER, including tachycardia and loss of blood pressure requiring administration of pressors, signified that she was in septic shock. Tr. at 167,

182 (Dr. Oddis's testimony); *id.* at 281 (Dr. Evans's testimony); *see* Annane at 63. Her hypotension was severe enough that she was treated with Levophed, which Dr. Oddis explained is "such a powerful medication to bring up blood pressure that it's often a terminal intervention." Tr. at 247. This magnitude of hypotension would not occur with pain, dehydration, or a lupus flareup. *Id.* The fact that she was afebrile did not rule out septic shock, because (1) Petitioner was immunosuppressed and might not mount a fever response; and (2) fever might not occur in the setting of overwhelming infection. Tr. at 236, 249; Annane at 63. Her altered mental status was also consistent with shock. Evans Rep. at 12.

Respondent's experts were also persuasive in explaining why Petitioner's lab results were indicative of septic shock. Dr. Oddis testified her CRP level was "off the wall" and signified "infection until proven otherwise." Tr. at 167-68, 253. It was not consistent with a lupus flareup. *Id.* at 234-35; *see* Ospina at i47 ("CRP increases significantly in SLE patients with concomitant infection, but increases only slightly or not at all in patients with a lupus flare and no infection[.]"). Her dsDNA and complement levels during admission were not suggestive of a severe lupus flareup. Evans Rep. at 15; Tr. at 250 (Dr. Oddis's testimony). Her elevated lactic acid level indicated that her body was not producing enough oxygen, and her creatinine level showed acute kidney dysfunction, a common symptom of septic shock. *Id.* at 288; Evans Rep. at 12-13. Dr. Oddis pointed out that the kidney function was quickly restored with treatment, which would not happen with a lupus flareup/lupus nephritis. Tr. at 248. Her blood tests were also highly suggestive of severe infection: the WBC count of 10.2 was very elevated for an immunosuppressed patient. Oddis Rep. at 7-8; Evans Rep. at 13 (Petitioner's high WBC and neutrophil levels were consistent with a "catastrophic infection."). Even though her WBC count had fluctuated before, the level recorded during her hospitalization was substantially elevated from her baseline, which would not occur with a lupus flareup. Tr. at 234. Lastly, she had high segmented neutrophils and a "highly abnormal" level of banded neutrophils, evidence that her bone marrow was producing new, immature white blood cells, as occurs in sepsis. Tr. at 167, 251 (Dr. Oddis's testimony); *id.* at 289-91 (Dr. Evans's testimony); Evans Rep. at 13; Annane at 67 ("Sepsis is associated with migration of activated leucocytes from the bloodstream to inflammatory tissues, and with intensified bone-marrow production of leucocytes that are released into the blood as newly differentiated or immature cells."). Dr. Valeriano did not attempt to dispute the significance of the immature white blood cells.

> 4. Petitioner tested positive for MRSA, and her negative blood cultures did not rule out sepsis.

On September 7, 2015, Petitioner tested positive for MRSA via a PCR test on a nasal swab sample. Ex. 3 at 146, 420. Her blood cultures, however, showed no growth of MRSA or any other organism. *Id.* at 142. Dr. Valeriano opined that the negative blood cultures suggested Petitioner did not have sepsis. Second Valeriano Rep. at 2; Tr. at 50-51.

This opinion was unpersuasive. The filed literature was clear that culture-negative septic shock ("CNSS") is a common phenomenon. *See* Gupta at 1251 (study finding that 47.1% of patients with sepsis had CNSS). This could be explained by the clinical practice of giving antibiotics before taking cultures, as was done in Petitioner's case. *Id.* at 1252; *see* Ex. 3 at 3 (recording that Petitioner was given two antibiotics, Keflex and Bactrim, at the time of her incision

and drainage procedure on September 4, 2015); *id.* at 38 (recording Petitioner was started on vancomycin, Zosyn, and acyclovir in the ER at PGH).  As Dr. Evans testified, Petitioner's prophylactic use of antibiotics could have rendered her blood cultures negative.  Tr. at 177, 185, 198.  Also, as Dr. Oddis remarked, Petitioner's positive PCR test for MRSA likely meant she was colonized with MRSA bacteria, which put her at risk of an active MRSA infection due to her immunosuppression.  *Id.* at 177.  Thus, Respondent's experts were persuasive in opining that, more likely than not, Petitioner's sepsis resulted from a MRSA infection, despite her negative cultures.

### 5.  Petitioner developed PRES, which can be caused by septic shock.

A few days after Petitioner was admitted to PGH, she experienced two seizures.  Ex. 3 at 241.  An EEG revealed moderate encephalopathy.  *Id.*  An MRI of the brain was interpreted to show PRES, possibly caused by hypertension, lupus, or other factors.  *Id.* at 190.  On September 10-11, 2015, Petitioner had several further seizures, one lasting 5-10 minutes.  *Id.* at 188, 191.  At that point, her team concluded she needed continuous EEG monitoring, prompting a transfer to UMMC.  *Id.* at 191.

Petitioner's treating neurologists at UMMC believed her MRIs and seizures "in the setting of [a] lupus flare up" were concerning for lupus cerebritis, but PRES and viral encephalopathy were also in the differential in light of the immunosuppressive medications she was on.  Ex. 6 at 44.  ADEM was also on the differential, though it was considered less likely.  *Id.* at 45.  A second MRI done on September 13, 2015, "showed striking cerebral and slight cerebellar leukoencephalopathy apparently a result of [SLE]."  Ex. 6 at 46.  Later imaging was read to show PRES.  *See* Ex. 6 at 235 (September 20, 2015 MRI interpreted to be "highly suggestive of PRES").

PRES, or posterior reversible encephalopathy syndrome, is

> an acute neurotoxic syndrome that is characterized by a spectrum neurological and radiological feature from various risk factors.  Common neurological symptoms include[] headache, impairment in level of consciousness, seizures, visual disturbances, and focal neurological deficits.  Common triggering factors include blood pressure fluctuations, renal failure, eclampsia, exposure to immunosuppressive or cytotoxic agents and autoimmune disorders.  The classic radiographic findings include bilateral subcortical vasogenic edema predominantly affecting the parieto-occipital regions but atypical features include involvement of other regions, cortical involvement, restricted diffusion, hemorrhage, contrast enhancement.

Hinduja at 1.  Although some of Petitioner's treating physicians considered her condition to be more consistent with lupus cerebritis than PRES, both parties' experts in this case agreed that PRES was a more appropriate diagnosis based on the imaging.  Tr. at 28, 30 (Dr. Valeriano's testimony); *id.* at 196 (Dr. Oddis's testimony); *id.* at 283 (Dr. Evans's testimony).

The evidence showed that PRES can be induced by septic shock. Evans Rep. at 16-17; Tr. at 193 (Dr. Oddis's testimony); Hinduja at 1 (blood pressure fluctuations and renal failure can cause PRES). PRES also has been reported in conjunction with lupus. *See* Ishimori at 441 (reporting that 26 cases of PRES in lupus patients were described in the literature; all of the reported cases were in people under 40, the majority of whom were female). Overall, while it was not dispositive of the issue, Petitioner's development of PRES was fully consistent with the conclusion that she suffered sepsis and septic shock, as Respondent's experts persuasively opined.

6.   The assessment by some of Petitioner's treating physicians of a lupus flareup was not supported by her overall clinical picture.

The records show that some of Petitioner's treating physicians believed her presentation was probably caused by a lupus flareup and not infection/sepsis. When she first presented to the ER at PGH, Dr. Schwartz commented that she was most likely experiencing a lupus flareup caused by the Tdap vaccination. Ex. 3 at 23. However, after Petitioner experienced extreme hypotension and tachycardia and was admitted, and after her lab results showed highly elevated CRP and ESR, hospitalist Dr. Kenmogne assessed "[p]ossible septic shock [p]robably due to the incised abscess." *Id.* at 136. Similarly, on September 8, 2015, Dr. Semeniuk diagnosed resolved distributive shock of unclear etiology. *Id.* at 181.

Dr. Harrison, the attending neurologist at UMMC, commented on September 12, 2015, that Petitioner's neurological symptoms occurred "in the setting of a lupus flareup" while she was at PGH. Ex. 6 at 44. He believed her seizures were caused by lupus cerebritis but did not rule out an infectious or inflammatory condition. *Id.* at 45. Other notes from the UMMC admission history stated that Petitioner had experienced "recent septic shock" along with "possible lupus cerebritis." Ex. 6 at 19. Later, after a lumbar puncture found no signs of infection, a UMMC rheumatologist commented that her symptoms could have been secondary to lupus. *Id.* at 102.

These somewhat conflicting statements underscore the clinical overlap between a severe lupus flareup and sepsis, as described in the literature. *See* Ospina at i46 ("[T]he initial clinical presentation of a patient with lupus is very similar to the acute febrile phase of an infection (such as sepsis)."). In this case, however, as described above, Respondent's experts persuasively and comprehensively explained why, more likely than not, Petitioner experienced septic shock and not a lupus flareup. Most notably, her lab values (i.e., WBC count, banded and segmented neutrophils, lactic acid, CRP, dsDNA, and complement levels), severe hypotension, and rapid normalization of kidney function with treatment pointed to septic shock and were less consistent with a lupus flareup. Moreover, all of the experts, including Dr. Valeriano, agreed that Petitioner probably did not develop lupus cerebritis at any time. *See* First Valeriano Rep. at 2; Evans Rep. at 14; Tr. at 196 (Dr. Oddis's testimony). Finally, Dr. Oddis explained that, to the extent she had a flareup of lupus symptoms in the hospital, it could have been secondary to her sepsis. Tr. at 190.

**B. Theories of Entitlement**

1.   Table Encephalopathy

39

Petitioner alleges she sustained the Table Injury of encephalopathy within 72 hours of her Tdap vaccination.  Pet.'s Post-Hrg. Br. at 3.

### a.  *Table Requirements*

A petitioner who receives a vaccine "containing whole cell pertussis bacteria, extracted or partial cell pertussis bacteria, or specific pertussis antigen(s) (*e.g.*, DTP, DTaP, P, DTP-Hib)" can establish the Table injury of encephalopathy if that injury acutely occurs within 72 hours of vaccination.  42 C.F.R. § 100.3(a)(II)(B).  According to the Table Qualifications and Aids to Interpretation ("QAIs"), encephalopathy is compensable as a Table injury if the acute encephalopathy occurs within the 72-hour period and evolves into a chronic encephalopathy.  *Id*. § 100.3(c)(2).

The QAIs provide that an "acute encephalopathy" in an adult is

> one that persists at least 24 hours and is characterized by at least two of the following: (1) A significant change in mental status that is not medication related (such as a confusional state, delirium, or psychosis); (2) A significantly decreased level of consciousness which is independent of a seizure and cannot be attributed to the effects of medication; and (3) A seizure associated with loss of consciousness.

42 C.F.R. § 100.3(c)(2)(i)(B). A chronic encephalopathy occurs when

> a change in mental or neurologic status, first manifested during the applicable Table time period as an acute encephalopathy or encephalitis, persists for at least 6 months from the first symptom or manifestation of onset or of significant aggravation of an acute encephalopathy or encephalitis.

*Id*. § 100.3(d)(1)(i).

The QAIs also set forth exclusionary criteria for encephalopathy, providing:

> Regardless of whether or not the specific cause of the underlying condition, systemic disease, or acute event (including an infectious organism) is known, ***an encephalopathy shall not be considered to be a condition set forth in the Table if it is shown that the encephalopathy was caused by***:
>
> (A) An underlying condition or systemic disease shown to be unrelated to the vaccine (such as malignancy, structural lesion, psychiatric illness, dementia, genetic disorder, prenatal or perinatal central nervous system (CNS) injury); or

40

> (B) ***An acute event shown to be unrelated to the vaccine such as*** a head trauma, stroke, transient ischemic attack, complicated migraine, drug use (illicit or prescribed) or ***an infectious disease***.

*Id.* § 100.3(c)(2)(ii) (emphasis added).

> b. *Petitioner's condition is excluded from the QAI definition of encephalopathy, because it was caused by an acute infectious disease.*

The parties agree, and I concur based on my review of the record, that Ms. Boyd suffered symptoms of an acute encephalopathy within 72 hours of her September 4, 2015 Tdap vaccination. Dr. Valeriano pointed out that she exhibited altered consciousness, lethargy, and loss of memory at the time of the initial presentation at PGH. First Valeriano Rep. at 3. These were new symptoms for her. *Id.* Dr. Evans also observed that Petitioner developed encephalopathy shortly after she returned to the ER about 32 hours after the vaccination. Evans Rep. at 20; *see also* Resp.'s Post-Hrg. Br. at 25 (Respondent stating he "no longer argues that petitioner's encephalopathy did not develop within 72 hours of vaccination.").

The key disagreement here is whether Petitioner's encephalopathy qualified as a vaccine-related Table injury or whether her condition fell within the QAI exclusionary criteria. This question hinges on whether Petitioner's encephalopathic symptoms had another cause – namely, acute septic shock triggered by infection.

For the reasons described in detail above, I conclude that Petitioner's sepsis and septic shock caused her clinical presentation on September 6, 2015, including her acute encephalopathy, and therefore her condition fell within the Table's exclusionary criteria for encephalopathy. Because I conclude she has failed to prove the Table injury of encephalopathy following her Tdap vaccination, I need not resolve whether she developed a chronic encephalopathy under the QAI.

### 2. Significant Aggravation

Petitioner alternatively alleges that the subject Tdap vaccination significantly aggravated her pre-existing lupus. Again, to establish entitlement under a significant aggravation theory, Petitioner must prove by a preponderance of the evidence:

> (1) The person's condition prior to administration of the vaccine, (2) the person's current condition (or the condition following the vaccination if that is also pertinent), (3) whether the person's current condition constitutes a 'significant aggravation' of the person's condition prior to vaccination, (4) a medical theory causally connecting such a significant worsened condition to the vaccination, (5) a logical sequence of cause and effect showing that the vaccination was the reason for the significant aggravation, and (6) a

> showing of a proximate temporal relationship between the
> vaccination and the significant aggravation.

*Loving v. Sec'y of Health & Hum. Servs.*, 86 Fed. Cl. 135, 144 (2009); *see also W.C. v. Sec'y of Health & Hum. Servs.*, 704 F.3d 1352, 1357 (Fed. Cir. 2013) (adopting this as the proper legal standard for significant aggravation claims brought under the Vaccine Act).

I conclude that Petitioner has failed to prove a vaccine-caused significant aggravation of her lupus. Most significantly, as discussed, she failed to demonstrate a significant aggravation of her lupus following the vaccination, as was persuasively explained by Respondent's experts. Instead, her post-vaccination medical course was more likely related to septic shock caused by infection. Thus, she did not satisfy *Loving* prong three.[24]

Even assuming *arguendo* that Petitioner satisfied *Loving* prong three, she also failed to satisfy *Loving* prongs four, five, or six. Due to Dr. Valeriano's self-admitted lack of expertise in immunology, he was unable to provide a reliable causation theory for how the Tdap vaccine could have exacerbated Petitioner's lupus. Tr. at 42, 89. He could not identify any component of the Tdap vaccine that likely caused the alleged significant aggravation of Petitioner's lupus, stating that it "really [was] beyond his expertise in vaccines." *Id.* at 42. He summarily hypothesized that the vaccine "set off an immune reaction which basically was an exacerbation of the underlying condition," without providing any further basis for that opinion. *Id.* at 86. He could not provide a proposed mechanism by which the vaccine could have caused a significant aggravation of lupus, other than an "immune stimulation" that acted pathologically on a susceptible person. *Id.* at 88. He forthrightly admitted that he was not at the requisite "level of immunology" to discuss that subject. *Id.* at 89. He also did not provide any persuasive clinical literature supporting the claim that the Tdap vaccine can exacerbate lupus.[25]

Moreover, although Dr. Valeriano cited literature discussing the notion that pertussis could have neurotoxic effects, he explicitly denied that he was proposing Petitioner was harmed by direct neurotoxicity from that component of the vaccine. Tr. at 42-43. Overall, Dr. Valeriano's failure to propose any theory or data for how the Tdap vaccine could have significantly aggravated Petitioner's pre-existing lupus was fatal to her claim. Petitioner failed to satisfy *Loving* prong four.

Under *Loving*'s fifth prong, a petitioner must "prove a logical sequence of cause and effect showing that the vaccination was the reason for the injury." *Loving*, 86 Fed. Cl. at 144; *Althen*,

---

[24] The experts debated whether Petitioner's pre-vaccination lupus was "stable" or "smoldering." *See* Tr. at 18-19 (Dr. Valeriano's testimony that Petitioner's lupus was stable); Tr. at 164-66 (Dr. Oddis's testimony that Petitioner's lupus was smoldering). For the purposes of my analysis, the status of her lupus before vaccination is not material, because I conclude Petitioner more likely than not developed septic shock, which caused her PRES and seizures, and did not suffer a lupus flareup.

[25] Petitioner did file four exhibits (Exs. 14-18), two of which were abstracts for studies involving lupus (not full publications) (Exs. 14-15), one of which was an abstract related to PRES (Ex. 16), and one of which was a printout of results of two VAERS database searches relating to DTP, Tdap, DTaP, and other tetanus-containing vaccines and "seizures" and "aggravation" (Ex. 17). These exhibits do not even suggest a causal association between Tdap and lupus exacerbation/seizures, much less meet the preponderance threshold.

418 F.3d at 1278.  The sequence of cause and effect must be "'logical' and legally probable, not medically or scientifically certain." *Id.*  A petitioner is not required to show "epidemiologic studies, rechallenge, the presence of pathological markers or genetic disposition, or general acceptance in the scientific or medical communities to establish a logical sequence of cause and effect." *Id.* (omitting internal citations); *Capizzano v. Sec'y of Health & Hum. Servs*., 440 F.3d 1317, 1325 (Fed. Cir. 2006).  Instead, circumstantial evidence and reliable medical opinions may be sufficient to satisfy the second *Althen* prong.  *Isaac v. Sec'y of Health & Hum. Servs*., No. 08-601V, 2012 WL 3609993, at \*24 (Fed. Cl. Spec. Mstr. July 30, 2012), *mot. for rev. den'd*, 108 Fed. Cl. 743 (2013), *aff'd*, 540 F. App'x. 999 (Fed. Cir. 2013).

Because Petitioner did not meet *Loving* prong four, she also could not prove a logical sequence of cause and effect between the subject vaccination and the purported exacerbation of her lupus.  Also, as discussed, the preponderant evidence showed Petitioner likely suffered septic shock caused by infection, which led her to develop PRES, rather than a vaccine injury.  I do note that one of Petitioner's treating physicians, Dr. Schwartz, stated: "Most likely lupus flare that was incited by tetanus shot."  Ex. 3 at 23.  Other treating physicians noted the temporal proximity between Petitioner's Tdap vaccination and the development of her symptoms without explicitly attributing her condition to the vaccine.  *See* Ex. 3 at 132; Ex. 6 at 45; Ex. 4 at 361.  Dr. Schwartz's comment was made very early on in Petitioner's clinical course, just after she presented to the hospital complaining of symptoms that she perceived as a lupus flareup.  Also, multiple other physicians opined that her symptoms and sequelae were caused by septic shock.  *See*  Ex. 3 at 136, 181, 183-84, 909 (resolved possible septic shock); Ex. 6 at 3, 19.  Finally, as detailed above, to the extent Petitioner's treating physicians believed she was suffering from a lupus flareup, those opinions were not supported by the overall clinical record.  Thus, Petitioner failed to prove *Loving* prong five.

The sixth prong of *Loving* contains two parts.  First, a petitioner must establish the "timeframe for which it is medically acceptable to infer causation," and second, he must demonstrate that the onset of the disease occurred in this period.  *Shapiro v. Sec'y of Health & Hum. Servs.,* 101 Fed. Cl. 532, 542-43 (2011), *recons. denied after remand on other grounds*, 105 Fed. Cl. 353 (2012), *aff'd without op.,* 503 F. App'x. 952 (Fed. Cir. 2013).  Dr. Valeriano did not identify an appropriate timeframe between Tdap vaccination and exacerbation of lupus, nor did he comment on whether the onset of Petitioner's post-vaccination symptoms fell within that timeframe.  Moreover, because Petitioner failed to provide a reliable theory for how the Tdap vaccination could significantly aggravate lupus, she also could not show the appropriate post-vaccination timeframe for such an injury.

### 3.  Causation-in-Fact of Seizure Disorder

Lastly, Petitioner has argued that the subject Tdap vaccination caused-in-fact a primary seizure disorder.  *See* Pet.'s Post-Hrg. Br. at 10.  This claim was very thinly supported.  Notably, Dr. Valeriano did not argue in his reports or testimony that the subject vaccination directly caused the development of seizures.  In fact, as discussed, he disclaimed holding the opinion that the pertussis component of the vaccine directly caused neurotoxicity in Petitioner.  He instead contended that Petitioner's vaccine-caused lupus flareup led her to develop PRES, which caused

43

her seizures.[26]  Respondent's experts agreed Petitioner developed PRES, which caused seizures, but again, they disagreed the PRES was triggered by lupus and instead persuasively argued it was caused by septic shock.  None of Petitioner's treating physicians theorized that Petitioner developed seizures directly caused by the vaccination.  Petitioner vaguely argued in her briefing that onset of seizures within three days of vaccination was appropriate, but this too was unsupported by any medical record, literature, or expert evidence.  *See id*. at 35.

Petitioner cited several cases concluding that pertussis-containing vaccines caused seizures.[27]  *See, e.g.*, *Andreu,* 569 F.3d at 1381-82 (finding petitioners preponderantly established that the DPT vaccine caused a seizure disorder); *Bunting v. Sec'y of Health & Hum. Servs.*, 931 F.2d 867 (Fed. Cir. 1991) (finding a preponderance of evidence that the DPT vaccine caused encephalopathy and seizure disorder); *Tembenis ex rel. estate of Tembenis v. Sec'y of Health & Hum. Servs.*, No. 03-2820V, 2010 WL 5164324 (Fed. Cl. Spec. Mstr. Nov. 29, 2010) (finding the DTaP vaccine caused a seizure disorder); *Sucher v. Sec'y of Health & Hum. Servs.*, No. 07-58V, 2010 WL 1370627 (Fed. Cl. Spec. Mstr. Mar. 15, 2010) (finding the DTaP vaccine induced a fever that triggered the onset of the minor's seizures); *Almeida v. Sec'y of Health & Hum. Servs.*, No. 96-412V, 1999 WL 1277566 (Fed. Cl. Spec. Mstr. Dec. 20, 1999) (finding the DPT vaccine significantly aggravated petitioner's preexisting seizure disorder).  Notably, all of these cases involved minors, and most involved the whole-cell pertussis vaccine, which is not analogous to the case at hand.  Only *Sucher* and *Tembenis* involved an acellular pertussis vaccine, DTaP, the formulation of which was for children.  Moreover, none of these cases are binding on me, nor can their conclusions be extrapolated wholesale to prove Petitioner's claim, which she has failed to substantiate with expert or medical record evidence.

In sum, Petitioner did not put forward any reliable expert or medical record evidence supporting a causation theory for how Tdap vaccination could cause a seizure disorder,

---

[26] I note that Petitioner did not argue that the Tdap vaccine caused her to develop PRES.  In another case alleging vaccine-caused PRES, entitlement was denied where the petitioner presented a much more robust causation theory than was proffered here.  *See Kaltenmark v. Sec'y of Health & Hum. Servs.*, No. 17-1362V, 2023 WL 8870299, at *30-35 (Fed. Cl. Spec. Mstr. Nov. 27, 2023).

[27] In her briefing, Petitioner commented that before 1995, the Vaccine Injury Table provided for compensation of "residual seizure disorders" occurring within three days of a DPT vaccination.  Pet.'s Post-Hrg. Br. at 15-16.  When making this point, however, Petitioner replaced the acronym "DPT" with "TDaP" without acknowledging that DPT and Tdap are different vaccines with materially different components.  *Id.* at 16.  As the Federal Circuit explained in *Andreu*:

> In recent years, most children in the United States have been inoculated with the DTaP vaccine, which contains an acellular pertussis component, as opposed to the DPT vaccine, which contains a whole-cell pertussis component.

*Andreu*, 569 F.3d 1367, 1375 n.1.  Tdap, the adult version of the DTaP vaccine, also contains acellular pertussis.  *See* Ex. 3 at 3 (listing components of the subject Tdap vaccine given to Petitioner).  Given that she ignored this important context, Petitioner's suggestion that a "Tdap/seizure disorder" claim would have been viable had it been brought before 1995 is unpersuasive.

demonstrating a logical sequence of cause and effect between the vaccination and the development of her seizures, or showing that her seizures occurred in a medically acceptable timeframe after vaccination.

## VI.  **CONCLUSION**

I am highly sympathetic to Petitioner's ordeal.  However, upon careful evaluation of all the evidence submitted in this matter, including the medical records, Petitioner's statement, the expert reports, the testimony, and the medical literature, I conclude that she has not shown by preponderant evidence that she is entitled to compensation under the Vaccine Act.  The Clerk's Office is instructed to issue a judgment in accord with this decision.[28]

**IT IS SO ORDERED.**

**s/ Jennifer A. Shah**
Jennifer A. Shah
Special Master

---

[28] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by each filing (either jointly or separately) a notice renouncing their right to seek review.